## SPEISER *v.* RANDALL, ASSESSOR OF CONTRA COSTA COUNTY, CALIFORNIA.

No. 483. Argued April 8–9, 1958.—Decided June 30, 1958.*

---

*Together with No. 484, *Prince* v. *City and County of San Francisco,* also on appeal from the same Court.

514

*Lawrence Speiser* argued the cause for appellants. With him on the brief was *Franklin H. Williams.*

*George W. McClure* argued the cause for appellee in No. 483, and *Robert M. Desky* argued the cause for appellee in No. 484. With them on the brief was *Dion R. Holm.*

*Shad Polier, Will Maslow* and *Leo Pfeffer* filed a brief for the American Jewish Congress, as *amicus curiae.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The appellants are honorably discharged veterans of World War II who claimed the veterans' property-tax

exemption provided by Art. XIII, § 1¼, of the California Constitution. Under California law applicants for such exemption must annually complete a standard form of application and file it with the local assessor. The form was revised in 1954 to add an oath by the applicant: "I do not advocate the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means, nor advocate the support of a foreign government against the United States in event of hostilities." Each refused to subscribe the oath and struck it from the form which he executed and filed for the tax year 1954–1955. Each contended that the exaction of the oath as a condition of obtaining a tax exemption was forbidden by the Federal Constitution. The respective assessors denied the exemption solely for the refusal to execute the oath. The Supreme Court of California sustained the assessors' actions against the appellants' claims of constitutional invalidity.[1] We noted probable jurisdiction of the appeals. 355 U. S. 880.

---

[1] Appellant in No. 483 sued for declaratory relief in the Superior Court of Contra Costa County. Five judges sitting *en banc* held that both § 19 of Art. XX and § 32 of the Revenue and Taxation Code were invalid under the Fourteenth Amendment as restrictions on freedom of speech. The California Supreme Court reversed. 48 Cal. 2d 903, 311 P. 2d 546.

Appellant in No. 484 sued in the Superior Court for the City and County of San Francisco to recover taxes paid under protest and for declaratory relief. The court upheld the validity of both the constitutional provision and § 32 of the Code. The Supreme Court affirmed. 48 Cal. 2d 472, 311 P. 2d 544.

In both cases the Supreme Court adopted the reasoning of its opinion in *First Unitarian Church* v. *County of Los Angeles*, 48 Cal. 2d 419, 311 P. 2d 508, in which identical issues are discussed at length. Hereinafter we will refer to that opinion as expressing the views of the California Supreme Court in the present cases.

Article XX, § 19, of the California Constitution, adopted at the general election of November 4, 1952, provides as follows:

"Notwithstanding any other provision of this Constitution, no person or organization which advocates the overthrow of the Government of the United States or the State by force or violence or other unlawful means or who advocates the support of a foreign government against the United States in the event of hostilities shall:

. . . . .

"(b) Receive any exemption from any tax imposed by this State or any county, city or county, city, district, political subdivision, authority, board, bureau, commission or other public agency of this State.

"The Legislature shall enact such laws as may be necessary to enforce the provisions of this section."

To effectuate this constitutional amendment the California Legislature enacted § 32 of the Revenue and Taxation Code, which requires the claimant, as a prerequisite to qualification for any property-tax exemption, to sign a statement on his tax return declaring that he does not engage in the activities described in the constitutional amendment.[2] The California Supreme Court held that

---

[2] Section 32 provides:

"Any statement, return, or other document in which is claimed any exemption, other than the householder's exemption, from any property tax imposed by this State or any county, city or county, city, district, political subdivision, authority, board, bureau, commission or other public agency of this State shall contain a declaration that the person or organization making the statement, return, or other document does not advocate the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means nor advocate the support of a foreign government against the United States in event of hostilities. If any

this declaration, like other statements required of those filing tax returns, was designed to relieve the tax assessor of "the burden . . . of ascertaining the facts with reference to tax exemption claimants." 48 Cal. 2d 419, 432, 311 P. 2d 508, 515. The declaration, while intended to provide a means of determining whether a claimant qualifies for the exemption under the constitutional amendment, is not conclusive evidence of eligibility. The assessor has the duty of investigating the facts underlying all tax liabilities and is empowered by § 454 of the Code to subpoena taxpayers for the purpose of questioning them about statements they have furnished. If the assessor believes that the claimant is not qualified in any respect, he may deny the exemption and require the claimant, on judicial review, to prove the incorrectness of the determination. In other words, the factual determination whether the taxpayer is eligible for the exemption under the constitutional amendment is made in precisely the same manner as the determination of any other fact bearing on tax liability.

The appellants attack these provisions, *inter alia*, as denying them freedom of speech without the procedural safeguards required by the Due Process Clause of the Fourteenth Amendment.[3]

---

such statement, return, or other document does not contain such declaration, the person or organization making such statement, return, or other document shall not receive any exemption from the tax to which the statement, return, or other document pertains. Any person or organization who makes such declaration knowing it to be false is guilty of a felony. This section shall be construed so as to effectuate the purpose of Section 19 of Article XX of the Constitution."

[3] This contention was raised in the complaint and is argued in the brief in this Court. The California Supreme Court rejected the contention as without merit. 48 Cal. 2d 472, 475, 311 P. 2d 544, 545–546.

Appellants also argue that these provisions are invalid (1) as invading liberty of speech protected by the Due Process Clause

518

## I.

It cannot be gainsaid that a discriminatory denial of a tax exemption for engaging in speech is a limitation on free speech. The Supreme Court of California recognized that these provisions were limitations on speech but concluded that "by no standard can the infringement upon freedom of speech imposed by section 19 of article XX be deemed a substantial one." 48 Cal. 2d 419, 440, 311 P. 2d 508, 521. It is settled that speech can be effectively limited by the exercise of the taxing power. *Grosjean* v. *American Press Co.*, 297 U. S. 233. To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech. The appellees are plainly mistaken in their argument that, because a tax exemption is a "privilege" or "bounty," its denial may not infringe speech. This contention did not prevail before the California courts, which recognized that conditions imposed upon the granting of privileges or gratuities must be "reasonable." It has been said that Congress may not by withdrawal of mailing privileges place limitations upon the freedom of speech which if directly attempted would be unconstitutional. See *Hannegan* v. *Esquire, Inc.*, 327 U. S. 146, 156; cf. *Milwaukee Publishing Co.* v. *Burleson*, 255 U. S. 407, 430–431 (Brandeis, J., dissenting). This Court has similarly rejected the contention that speech was not abridged when the

---

of the Fourteenth Amendment; (2) as denying equal protection because the oath is required only as to property-tax and corporation-income-tax exemptions, but not as to the householder's personal-income-tax, gift-tax, inheritance-tax, or sales-tax exemptions; and (3) as violating the Supremacy Clause because this legislation intrudes in a field of exclusive federal control, *Pennsylvania* v. *Nelson*, 350 U. S. 497. Our disposition of the cases makes considerations of these questions unnecessary.

sole restraint on its exercise was withdrawal of the opportunity to invoke the facilities of the National Labor Relations Board, *American Communications Assn.* v. *Douds,* 339 U. S. 382, 402, or the opportunity for public employment, *Wieman* v. *Updegraff,* 344 U. S. 183. So here, the denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech. The denial is "frankly aimed at the suppression of dangerous ideas." *American Communications Assn.* v. *Douds, supra,* at 402.

The Supreme Court of California construed the constitutional amendment as denying the tax exemptions only to claimants who engage in speech which may be criminally punished consistently with the free-speech guarantees of the Federal Constitution. The court defined advocacy of "the overthrow of the Government . . . by force or violence or other unlawful means" and advocacy of "support of a foreign government against the United States in event of hostilities" as reaching only conduct which may constitutionally be punished under either the California Criminal Syndicalism Act, Cal. Stat. 1919, c. 188, see *Whitney* v. *California,* 274 U. S. 357, or the Federal Smith Act, 18 U. S. C. § 2385. 48 Cal. 2d, at 428, 311 P. 2d, at 513. It also said that it would apply the standards set down by this Court in *Dennis* v. *United States,* 341 U. S. 494, in ascertaining the circumstances which would justify punishing speech as a crime.[4] Of course the constitutional and statutory provisions here involved must be read in light of the restrictive construction that the California court, in the exercise of its function of interpreting state law, has placed upon them. For

---

[4] The California Supreme Court construed these provisions as inapplicable to mere belief. On oral argument counsel for the taxing authorities further conceded that the provisions would not apply in the case of advocacy of mere "abstract doctrine." See *Yates* v. *United States,* 354 U. S. 298, 312–327.

the purposes of this case we assume without deciding that California may deny tax exemptions to persons who engage in the proscribed speech for which they might be fined or imprisoned.[5]

## II.

But the question remains whether California has chosen a fair method for determining when a claimant is a member of that class to which the California court has said the constitutional and statutory provisions extend. When we deal with the complex of strands in the web of freedoms which make up free speech, the operation and effect of the method by which speech is sought to be restrained must be subjected to close analysis and critical judgment in the light of the particular circumstances to which it is applied. *Kingsley Books, Inc.,* v. *Brown,* 354 U. S. 436, 441–442; *Near* v. *Minnesota,* 283 U. S. 697; cf. *Cantwell* v. *Connecticut,* 310 U. S. 296, 305; *Joseph Burstyn, Inc.,* v. *Wilson,* 343 U. S. 495; *Winters* v. *New York,* 333 U. S. 507; *Niemotko* v. *Maryland,* 340 U. S. 268; *Staub* v. *City of Baxley,* 355 U. S. 313.

To experienced lawyers it is commonplace that the outcome of a lawsuit—and hence the vindication of legal rights—depends more often on how the factfinder appraises the facts than on a disputed construction of a statute or interpretation of a line of precedents. Thus the procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied. And the more important the rights at stake the more important

---

[5] Appellants contend that under this Court's decision in *Pennsylvania* v. *Nelson,* 350 U. S. 497, the State can no longer enforce its criminal statutes aimed at subversion. We need not decide whether this contention is sound; nor need we consider whether, if it is, it follows that California cannot deny tax exemptions to those who in fact are in violation of the federal and state sedition laws.

must be the procedural safeguards surrounding those rights. Cf. *Powell* v. *Alabama,* 287 U. S. 45, 71. When the State undertakes to restrain unlawful advocacy it must provide procedures which are adequate to safeguard against infringement of constitutionally protected rights—rights which we value most highly and which are essential to the workings of a free society. Moreover, since only considerations of the greatest urgency can justify restrictions on speech, and since the validity of a restraint on speech in each case depends on careful analysis of the particular circumstances, cf. *Dennis* v. *United States, supra; Whitney* v. *California, supra,* the procedures by which the facts of the case are adjudicated are of special importance and the validity of the restraint may turn on the safeguards which they afford. Compare *Kunz* v. *New York,* 340 U. S. 290, with *Feiner* v. *New York,* 340 U. S. 315. It becomes essential, therefore, to scrutinize the procedures by which California has sought to restrain speech.

The principal feature of the California procedure, as the appellees themselves point out, is that the appellants, "as taxpayers under state law, have the affirmative burden of proof, in Court as well as before the Assessor. . . . [I]t is their burden to show that they are proper persons to qualify under the self-executing constitutional provision for the tax exemption in question—i. e., that they are not persons who advocate the overthrow of the government of the United States or the State by force or violence or other unlawful means or who advocate the support of a foreign government against the United States in the event of hostilities. . . . [T]he burden is on *them* to produce evidence justifying their claim of exemption." [6]

---

[6] The California Supreme Court held that § 19 of Art. XX of the State Constitution was in effect self-executing. "[U]nder the tax laws of the state wholly apart from section 32 it is the duty of the assessor to ascertain the facts with reference to the taxability or

Not only does the initial burden of bringing forth proof of nonadvocacy rest on the taxpayer, but throughout the judicial and administrative proceedings the burden lies on the taxpayer of persuading the assessor, or the court, that he falls outside the class denied the tax exemption. The declaration required by § 32 is but a part of the probative process by which the State seeks to determine which taxpayers fall into the proscribed category.[7] Thus

exemption from taxation of property within his jurisdiction. And it is also the duty of the property owner to cooperate with the assessor and assist him in the ascertainment of these facts by declarations under oath." 48 Cal. 2d, at 430, 311 P. 2d, at 514–515.

In all events, if the assessor "is satisfied from his investigations that the exemption should not be allowed he may assess the property as not exempt and if contested compel a determination of the facts in a suit to recover the tax paid under protest. In such a case it would be necessary for the claimant to allege and prove facts with reference to the nature, extent and character of the property which would justify the exemption and compliance with all valid regulations in the presentation and prosecution of the claim. In any event it is the duty of the assessor to ascertain the facts from any legal source available. In performing this task he is engaged in the assembly of facts which are to serve as a guide in arriving at his conclusion whether an exemption should or should not be allowed. That conclusion is in no wise a final determination that the claimant belongs to a class proscribed by section 19 of article XX or is guilty of any activity there denounced. The presumption of innocence available to all in criminal prosecutions does not in a case such as this relieve or prevent the assessor from making the investigation enjoined upon him by law to see that exemptions are not improperly allowed. His administrative determination is not binding on the tax exemption claimant but it is sufficient to authorize him to tax the property as nonexempt and to place the burden on the claimant to test the validity of his administrative determination in an action at law." 48 Cal. 2d, at 431–432, 311 P. 2d, at 515.

[7] It is suggested that the opinion of the California Supreme Court be read as holding that "the filing, whether the oath be true or false, would conclusively establish the taxpayer's eligibility for an exemption." But the California court expressly states that "it is the duty of the assessor to see that exemptions are not allowed contrary to law

the declaration cannot be regarded as having such independent significance that failure to sign it precludes review of the validity of the procedure of which it is a part. Cf. *Staub* v. *City of Baxley, supra,* at 318–319. The question for decision, therefore, is whether this allocation of the burden of proof, on an issue concerning freedom of speech, falls short of the requirements of due process.

It is of course within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion, "unless in so doing it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder* v. *Massachusetts,* 291 U. S. 97, 105. "[O]f course the legislature may go a good way in raising . . . [presumptions] or in changing the burden of proof, but there are limits. . . . [I]t is not within the province of a legis-

_____

and this of course includes those which are contrary to the prohibitions provided for in section 19 of article XX," 48 Cal. 2d 419, 431, 311 P. 2d 508, 515, and that the "mandatory and prohibitory" provision of § 19 of Art. XX "applies to all tax exemption claimants." 48 Cal. 2d, at 428, 311 P. 2d, at 513. Indeed, the tax authorities of California themselves point out that the signing of the declaration is not conclusive of the right to the tax exemption. The brief of the taxing authorities in the companion case, *First Unitarian Church* v. *County of Los Angeles, post,* p. 545, states, "Section 32 is an evidentiary provision. Its purpose and effect are to afford to the Assessor information *to guide his compliance* with and his enforcement of the Constitution's prohibition . . . ." (Emphasis supplied.)

It is also suggested that this Court construe the California legislation contrary to the clearly expressed construction of the California Supreme Court and thus avoid decision of the question of procedural due process. But this construction would not avoid decision of constitutional questions but rather would create the necessity for decision of the broader constitutional question of the validity of § 19 of Art. XX. A more fundamental objection to the suggestion, of course, is that it does violence to the basic constitutional principle that the construction of state laws is the exclusive responsibility of the state courts.

lature to declare an individual guilty or presumptively guilty of a crime." *McFarland* v. *American Sugar Refining Co.*, 241 U. S. 79, 86. The legislature cannot "place upon all defendants in criminal cases the burden of going forward with the evidence . . . . [It cannot] validly command that the finding of an indictment, or mere proof of the identity of the accused, should create a presumption of the existence of all the facts essential to guilt. This is not permissible." *Tot* v. *United States*, 319 U. S. 463, 469. Of course, the burden of going forward with the evidence at some stages of a criminal trial may be placed on the defendant, but only after the State has "proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression." *Morrison* v. *California*, 291 U. S. 82, 88–89. In civil cases too this Court has struck down state statutes unfairly shifting the burden of proof. *Western & A. R. Co.* v. *Henderson*, 279 U. S. 639; cf. *Mobile, J. & K. C. R. Co.* v. *Turnipseed*, 219 U. S. 35, 43.

It is true that due process may not always compel the full formalities of a criminal prosecution before criminal advocacy can be suppressed or deterred, but it is clear that the State which attempts to do so must provide procedures amply adequate to safeguard against invasion speech which the Constitution protects. *Kingsley Books, Inc.*, v. *Brown, supra.* It is, of course, familiar practice in the administration of a tax program for the taxpayer to carry the burden of introducing evidence to rebut the determination of the collector. *Phillips* v. *Dime Trust Co.*, 284 U. S. 160, 167; *Brown* v. *Helvering*, 291 U. S. 193, 199. But while the fairness of placing the burden of proof on the taxpayer in most circumstances is

recognized, this Court has not hesitated to declare a summary tax-collection procedure a violation of due process when the purported tax was shown to be in reality a penalty for a crime. *Lipke* v. *Lederer,* 259 U. S. 557; cf. *Helwig* v. *United States,* 188 U. S. 605. The underlying rationale of these cases is that where a person is to suffer a penalty for a crime he is entitled to greater procedural safeguards than when only the amount of his tax liability is in issue. Similarly it does not follow that because only a tax liability is here involved, the ordinary tax assessment procedures are adequate when applied to penalize speech.

It is true that in the present case the appellees purport to do no more than compute the amount of the taxpayer's liability in accordance with the usual procedures, but in fact they have undertaken to determine whether certain speech falls within a class which constitutionally may be curtailed. As cases decided in this Court have abundantly demonstrated, the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn. *Thomas* v. *Collins,* 323 U. S. 516; cf. *Yates* v. *United States,* 354 U. S. 298. The separation of legitimate from illegitimate speech calls for more sensitive tools than California has supplied. In all kinds of litigation it is plain that where the burden of proof lies may be decisive of the outcome. *Cities Service Oil Co.* v. *Dunlap,* 308 U. S. 208; *United States* v. *New York, N. H. & H. R. Co.,* 355 U. S. 253; *Sampson* v. *Channell,* 110 F. 2d 754, 758. There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first

instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt. *Tot* v. *United States, supra.* Where the transcendent value of speech is involved, due process certainly requires in the circumstances of this case that the State bear the burden of persuasion to show that the appellants engaged in criminal speech. Cf. *Kingsley Books, Inc.,* v. *Brown, supra.*

The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding— inherent in all litigation—will create the danger that the legitimate utterance will be penalized. The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens. This is especially to be feared when the complexity of the proofs and the generality of the standards applied, cf. *Dennis* v. *United States, supra,* provide but shifting sands on which the litigant must maintain his position. How can a claimant whose declaration is rejected possibly sustain the burden of proving the negative of these complex factual elements? In practical operation, therefore, this procedural device must necessarily produce a result which the State could not command directly. It can only result in a deterrence of speech which the Constitution makes free. "It is apparent that a constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment. The power to create presumptions is not a means of escape from constitutional restrictions." *Bailey* v. *Alabama,* 219 U. S. 219, 239.

The appellees, in controverting this position, rely on cases in which this Court has sustained the validity of loyalty oaths required of public employees, *Garner* v. *Board of Public Works,* 341 U. S. 716, candidates for public office, *Gerende* v. *Board of Supervisors,* 341 U. S. 56, and officers of labor unions, *American Communications Assn.* v. *Douds, supra.* In these cases, however, there was no attempt directly to control speech but rather to protect, from an evil shown to be grave, some interest clearly within the sphere of governmental concern. The purpose of the legislation sustained in the *Douds* case, the Court found, was to minimize the danger of political strikes disruptive of interstate commerce by discouraging labor unions from electing Communist Party members to union office. While the Court recognized that the necessary effect of the legislation was to discourage the exercise of rights protected by the First Amendment, this consequence was said to be only indirect. The congressional purpose was to achieve an objective other than restraint on speech. Only the method of achieving this end touched on protected rights and that only tangentially. The evil at which Congress had attempted to strike in that case was thought sufficiently grave to justify limited infringement of political rights. Similar considerations governed the other cases. Each case concerned a limited class of persons in or aspiring to public positions by virtue of which they could, if evilly motivated, create serious danger to the public safety. The principal aim of those statutes was not to penalize political beliefs but to deny positions to persons supposed to be dangerous because the position might be misused to the detriment of the public. The present legislation, however, can have no such justification. It purports to deal directly with speech and the expression of political ideas. "Encouragement to loyalty to our institutions . . . [is a doctrine] which the state has plainly promulgated and intends to foster." 48 Cal.

2d, at 439, 311 P. 2d, at 520. The State argues that veterans as a class occupy a position of special trust and influence in the community, and therefore any veteran who engages in the proscribed advocacy constitutes a special danger to the State. But while a union official or public employee may be deprived of his position and thereby removed from the place of special danger, the State is powerless to erase the service which the veteran has rendered his country; though he be denied a tax exemption, he remains a veteran. The State, consequently, can act against the veteran only as it can act against any other citizen, by imposing penalties to deter the unlawful conduct.

Moreover, the oaths required in those cases performed a very different function from the declaration in issue here. In the earlier cases it appears that the loyalty oath, once signed, became conclusive evidence of the facts attested so far as the right to office was concerned. If the person took the oath he retained his position. The oath was not part of a device to shift to the officeholder the burden of proving his right to retain his position.[8] The signer, of course, could be prosecuted for perjury, but only in accordance with the strict procedural safeguards surrounding such criminal prosecutions. In the present case, however, it is clear that the declaration may be accepted or rejected on the basis of incompetent information or no information at all. It is only a step in a process throughout which the taxpayer must bear the burden of proof.

Believing that the principles of those cases have no application here, we hold that when the constitutional

---

[8] Significantly, the New York statute which this Court upheld in *Adler* v. *Board of Education*, 342 U. S. 485, provided that public-school teachers could be dismissed on security grounds only after a hearing at which the official pressing the charges sustained his burden of proof by a fair preponderance of the evidence.

right to speak is sought to be deterred by a State's general taxing program due process demands that the speech be unencumbered until the State comes forward with sufficient proof to justify its inhibition. The State clearly has no such compelling interest at stake as to justify a short-cut procedure which must inevitably result in suppressing protected speech. Accordingly, though the validity of § 19 of Art. XX of the State Constitution be conceded *arguendo,* its enforcement through procedures which place the burdens of proof and persuasion on the taxpayer is a violation of due process. It follows from this that appellants could not be required to execute the declaration as a condition for obtaining a tax exemption or as a condition for the assessor proceeding further in determining whether they were entitled to such an exemption. Since the entire statutory procedure, by placing the burden of proof on the claimants, violated the requirements of due process, appellants were not obliged to take the first step in such a procedure.

The judgments are reversed and the causes are remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BURTON concurs in the result.

THE CHIEF JUSTICE took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, whom MR. JUSTICE DOUGLAS joins, concurring.*

California, in effect, has imposed a tax on belief and expression. In my view, a levy of this nature is wholly out of place in this country; so far as I know such a thing

*[NOTE: This opinion applies also to No. 382, *First Unitarian Church* v. *County of Los Angeles,* and No. 385, *Valley Unitarian-Universalist Church* v. *County of Los Angeles, post,* p. 545.]

has never even been attempted before. I believe that it constitutes a palpable violation of the First Amendment, which of course is applicable in all its particulars to the States. See, *e. g.*, *Staub* v. *City of Baxley*, 355 U. S. 313; *Poulos* v. *New Hampshire*, 345 U. S. 395, 396–397; *Everson* v. *Board of Education*, 330 U. S. 1, 8; *Thomas* v. *Collins*, 323 U. S. 516; *Board of Education* v. *Barnette*, 319 U. S. 624, 639; *Douglas* v. *Jeannette*, 319 U. S. 157, 162; *Martin* v. *Struthers*, 319 U. S. 141; *Murdock* v. *Pennsylvania*, 319 U. S. 105, 109; *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571; *Bridges* v. *California*, 314 U. S. 252, 263; *Cantwell* v. *Connecticut*, 310 U. S. 296, 303; *Schneider* v. *State*, 308 U. S. 147, 160; *Lovell* v. *Griffin*, 303 U. S. 444, 450; *De Jonge* v. *Oregon*, 299 U. S. 353, 364; *Gitlow* v. *New York*, 268 U. S. 652, 666. The mere fact that California attempts to exact this ill-concealed penalty from individuals and churches and that its validity has to be considered in this Court only emphasizes how dangerously far we have departed from the fundamental principles of freedom declared in the First Amendment. We should never forget that the freedoms secured by that Amendment—Speech, Press, Religion, Petition and Assembly—are absolutely indispensable for the preservation of a free society in which government is based upon the consent of an informed citizenry and is dedicated to the protection of the rights of all, even the most despised minorities. See *American Communications Assn.* v. *Douds*, 339 U. S. 382, 445 (dissenting opinion); *Dennis* v. *United States*, 341 U. S. 494, 580 (dissenting opinion).

This case offers just another example of a wide-scale effort by government in this country to impose penalties and disabilities on everyone who is or is suspected of being a "Communist" or who is not ready at all times and all places to swear his loyalty to State and Nation. Compare *Adler* v. *Board of Education*, 342 U. S. 485, 496 (dis-

senting opinion); *Wieman* v. *Updegraff*, 344 U. S. 183, 193 (concurring opinion); *Barsky* v. *Board of Regents*, 347 U. S. 442, 456, 472 (dissenting opinions). Government employees, lawyers, doctors, teachers, pharmacists, veterinarians, subway conductors, industrial workers and a multitude of others have been denied an opportunity to work at their trade or profession for these reasons. Here a tax is levied unless the taxpayer makes an oath that he does not and will not in the future advocate certain things; in Ohio those without jobs have been denied unemployment insurance unless they are willing to swear that they do not hold specific views; and Congress has even attempted to deny public housing to needy families unless they first demonstrate their loyalty. These are merely random samples; I will not take time here to refer to innumerable others, such as oaths for hunters and fishermen, wrestlers and boxers and junk dealers.

I am convinced that this whole business of penalizing people because of their views and expressions concerning government is hopelessly repugnant to the principles of freedom upon which this Nation was founded and which have helped to make it the greatest in the world. As stated in prior cases, I believe "that the First Amendment grants an absolute right to believe in any governmental system, [to] discuss all governmental affairs, and [to] argue for desired changes in the existing order. This freedom is too dangerous for bad, tyrannical governments to permit. But those who wrote and adopted our First Amendment weighed those dangers against the dangers of censorship and deliberately chose the First Amendment's unequivocal command that freedom of assembly, petition, speech and press shall not be abridged. I happen to believe this was a wise choice and that our free way of life enlists such respect and love that our Nation cannot be imperiled by mere talk." *Carlson* v. *Landon*, 342 U. S. 524, 555 -556 (dissenting opinion).

Loyalty oaths, as well as other contemporary "security measures," tend to stifle all forms of unorthodox or unpopular thinking or expression—the kind of thought and expression which has played such a vital and beneficial role in the history of this Nation. The result is a stultifying conformity which in the end may well turn out to be more destructive to our free society than foreign agents could ever hope to be. The course which we have been following the last decade is not the course of a strong, free, secure people, but that of the frightened, the insecure, the intolerant. I am certain that loyalty to the United States can never be secured by the endless proliferation of "loyalty" oaths; loyalty must arise spontaneously from the hearts of people who love their country and respect their government. I also adhere to the proposition that the "First Amendment provides the only kind of security system that can preserve a free government—one that leaves the way wide open for people to favor, discuss, advocate, or incite causes and doctrines however obnoxious and antagonistic such views may be to the rest of us." *Yates* v. *United States,* 354 U. S. 298, 344 (separate opinion).

If it be assumed however, as Mr. Justice Brennan does for purposes of this case, that California may tax the expression of certain views, I am in full agreement with him that the procedures it has provided to determine whether petitioners are engaged in "taxable" advocacy violate the requirements of due process.

Mr. Justice Douglas, with whom Mr. Justice Black agrees, concurring.

While I substantially agree with the opinion of the Court, I will state my reasons more fully and more explicitly.

I. The State by the device of the loyalty oath places the burden of proving loyalty on the citizen. That pro-

cedural device goes against the grain of our constitutional system, for every man is presumed innocent until guilt is established. This technique is an ancient one that was denounced in an early period of our history.

Alexander Hamilton, writing in 1784 under the name Phocion, said:

> ". . . let it be supposed that instead of the mode of indictment and trial by jury, the Legislature was to declare, that every citizen who did not swear he had never adhered to the King of Great Britain, should incur all the penalties which our treason laws prescribe. Would this not be . . . a direct infringement of the Constitution? . . . it is substituting a new and arbitrary mode of prosecution to · that ancient and highly esteemed one, recognized by the laws and the Constitution of the State,—I mean the trial by jury." 4 The Works of Alexander Hamilton (Fed. ed. 1904) 269–270.

Hamilton compared that hypothetical law to an actual one passed by New York on March 27, 1778, whereby a person who had served the King of England in enumerated ways was declared "to be utterly disabled disqualified and incapacitated to vote either by ballot or *viva voce* at any election" in New York. N. Y. Laws 1777–1784, 35. An oath was required [1] in enforcement of that law.[2]

---

[1] The oath was prescribed by the Council in charge of the Southern District of New York. The Council, authorized by the Act of October 23, 1779, was composed of the Governor, President of the Senate, Chancellor, Supreme Court judges, Senators, Assemblymen, Secretary of State, Attorney General, and County Court judges. The Council was to assume authority "whenever the enemy shall abandon or be dispossessed of the same, and until the legislature can be convened," N. Y. Laws 1777–1784, 192. The Council governed from November 25, 1783, to February 5, 1784. See Barck,

534

Hamilton called this "a subversion of one great principle of social security: to wit, that every man shall be presumed innocent until he is proved guilty." 4 The Works of Alexander Hamilton (Fed. ed. 1904) 269. He went on to say "This was to invert the order of things; and, instead of obliging the State to prove the guilt in order to inflict the penalty, it was to oblige the citizen to establish his own innocence to avoid the penalty. It was to excite scruples in the honest and conscientious, and to hold out a bribe to perjury." *Ibid.*

New York City 1776–1783 (1931), 220–221. Among the powers of the Council was control of elections.

The election oath prescribed by the Council read as follows:

"I .................... do solemnly, without any mental Reservation or Equivocation whatsoever, swear and declare, and call God to witness (or if of the People called Quakers, affirm) that I renounce and abjure all Allegiance to the King of Great-Britain; and that I will bear true Faith and Allegiance to the State of New-York, as a Free and Independent State, and that I will in all Things, to the best of my Knowledge and Ability, do my Duty as a good and faithful Subject of the said State ought to do. So help me God." Independent Gazette, Dec. 13, 1783.

The Council further provided:

"That if any Person presenting himself to give his Vote, shall be suspected of, or charged with having committed any of the Offences above specified, it shall be Lawful for the Inspectors, or Superintendents (as the Case may be) to inquire into and determine the Fact whereof such Person shall be suspected, or wherewith he shall be charged, as the Cause of Disqualification, on the Oath of one or more Witnesses, or on the Oath of the Party so suspected or charged, at their Discretion; and if such Fact shall, in the Judgement of the Inspectors or Superintendents, be established, it shall be lawful for them, and they are hereby required, to reject the Vote of such Person at such Election." Independent Gazette, Dec. 13, 1783.

[2] Other loyalty oaths appeared during this early period. Suspected persons were required to take a loyalty oath. N. Y. Laws 1777–1784, 87. The same was required of lawyers. *Id.*, at 155, 420. And see Flick, Loyalism in New York During the American Revolution, 14 Studies in History, Economics and Public Law (Columbia Univ. 1901) 9 (*passim*).

If the aim is to apprehend those who have lifted a hand against the Government, the procedure is unconstitutional.

If one conspires to overthrow the Government, he commits a crime. To make him swear he is innocent to avoid the consequences of a law is to put on him the burden of proving his innocence. That method does not square with our standards of procedural due process, as the opinion of the Court points out.

The Court in *Cummings* v. *Missouri*, 4 Wall. 277, 328, denounced another expurgatory oath that had some of the vices of the present one.

> "The clauses in question subvert the presumptions of innocence, and alter the rules of evidence, which heretofore, under the universally recognized principles of the common law, have been supposed to be fundamental and unchangeable. They assume that the parties are guilty; they call upon the parties to establish their innocence; and they declare that such innocence can be shown only in one way—by an inquisition, in the form of an expurgatory oath, into the consciences of the parties."

II. If the aim of the law is not to apprehend criminals but to penalize advocacy, it likewise must fall. Since the time that Alexander Hamilton wrote concerning these oaths, the Bill of Rights was adopted; and then much later came the Fourteenth Amendment. As a result of the latter a rather broad range of liberties was newly guaranteed to the citizen against state action. Included were those contained in the First Amendment—the right to speak freely, the right to believe what one chooses, the right of conscience. *Stromberg* v. *California*, 283 U. S. 359; *Murdock* v. *Pennsylvania*, 319 U. S. 105; *Staub* v. *City of Baxley*, 355 U. S. 313. Today what one thinks or believes, what one utters and says have the full protection

of the First Amendment. It is only his actions that government may examine and penalize. When we allow government to probe his beliefs and withhold from him some of the privileges of citizenship because of what he thinks, we do indeed "invert the order of things," to use Hamilton's phrase. All public officials—state and federal—must take an oath to support the Constitution by the express command of Article VI of the Constitution. And see *Gerende* v. *Election Board,* 341 U. S. 56. But otherwise the domains of conscience and belief have been set aside and protected from government intrusion. *Board of Education* v. *Barnette,* 319 U. S. 624. What a man thinks is of no concern to government. "The First Amendment gives freedom of mind the same security as freedom of conscience." *Thomas* v. *Collins,* 323 U. S. 516, 531. Advocacy and belief go hand in hand. For there can be no true freedom of mind if thoughts are secure only when they are pent up.

In *Murdock* v. *Pennsylvania, supra,* we stated, "Plainly a community may not suppress, or the state tax, the dissemination of views because they are unpopular, annoying or distasteful." 319 U. S., at 116. If the Government may not impose a tax upon the expression of ideas in order to discourage them, it may not achieve the same end by reducing the individual who expresses his views to second-class citizenship by withholding tax benefits granted others. When government denies a tax exemption because of the citizen's belief, it penalizes that belief. That is different only in form, not in substance, from the "taxes on knowledge" which have had a notorious history in the English-speaking world. See *Grosjean* v. *American Press Co.,* 297 U. S. 233, 246–247.

We deal here with a type of advocacy which, to say the least, lies close to the "constitutional danger zone." *Yates* v. *United States,* 354 U. S. 298, 319. Advocacy which is in no way brigaded with action should always be pro-

tected by the First Amendment. That protection should extend even to the ideas we despise. As Mr. Justice Holmes wrote in dissent in *Gitlow* v. *New York,* 268 U. S. 652, 673, "If in the long run the beliefs expressed in proletarian dictatorship are destined to be accepted by the dominant forces of the community, the only meaning of free speech is that they should be given their chance and have their way." It is time for government—state or federal—to become concerned with the citizen's advocacy when his ideas and beliefs move into the realm of action.

The California oath is not related to unlawful action. To get the tax exemption the taxpayer must swear he "does not advocate the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means nor advocate the support of a foreign government against the United States in event of hostilities." [3] The Court construes the opinion of the California Supreme Court as applying the same test of illegal advocacy as was sustained against constitutional challenge in *Dennis* v. *United States,* 341 U. S. 494. That case held that advocacy of the overthrow of government by force and violence was not enough, that incitement to action, as well as clear and present danger, were also essential ingredients. *Id.,* at 512, 509–510. As *Yates* v. *United States, supra,* makes clear, there is still a clear constitutional line between advocacy of abstract doctrine and advocacy of action. The California Supreme Court said, to be sure, that the oath in question "is concerned" with that kind of advocacy.[4] But it nowhere says that oath is limited to that kind of advocacy. It seemed to think that advocacy was itself action for it said, "What one may merely believe is not prohibited.

---

[3] Calif. Rev. & Tax Code, § 32; and see Calif. Const., Art. XX, § 19.

[4] 48 Cal. 2d 419, 440, 311 P. 2d 508, 520.

It is only advocates of the subversive doctrines who are affected. Advocacy constitutes action and the instigation of action, not mere belief or opinion." [5]

However the California opinion may be read, these judgments should fall. If the construction of the oath is the one I prefer, then the Supreme Court of California has obliterated the line between advocacy of abstract doctrine and advocacy of action. If the California oath has been limited by judicial construction to the type of advocacy condemned in *Dennis,* it still should fall. My disagreement with that decision has not abated. No conspiracy to overthrow the Government was involved. Speech and speech alone was the offense. I repeat that thought and speech go hand in hand. There is no real freedom of thought if ideas must be suppressed. There can be no freedom of the mind unless ideas can be uttered.

I know of no power that enables any government under our Constitution to become the monitor of thought, as this statute would have it become.

Mr. Justice Clark, dissenting.

The decision of the Court turns on a construction of California law which regards the filing of the California tax oath as introductory, not conclusive, in nature. Hence, once the oath is filed, it may be "accepted or rejected on the basis of incompetent information or no information at all." And the filing is "only a step in a process throughout which the taxpayer must bear the burden of proof."

No California case, least of all the present one, compels such an understanding of § 32 of the California Revenue and Taxation Code. Neither appellant here filed the required oath, so the procedural skeleton of this case is not enlightening. If anything, the opinion of the state

---

[5] 48 Cal. 2d, at 434, 311 P. 2d, at 517.

court indicates that the filing, whether the oath be true or false, would conclusively establish the taxpayer's eligibility for an exemption. Thus, in explaining the effect of § 32, the California court stated:

"For the obvious purpose, among others, of avoiding litigation, the Legislature, throughout the years has sought to relieve the assessor of the burden, on his own initiative and at the public expense, of ascertaining the facts with reference to tax exemption claimants. In addition to the means heretofore and otherwise provided by law the Legislature, with special reference to the implementation of section 19 of article XX, has enacted section 32. That section provides a direct, time saving and relatively inexpensive method *of ascertaining the facts.*" (Emphasis added.) 48 Cal. 2d 419, 432, 311 P. 508, 515–516.

Moreover, the recourse of the State in the event a false oath is filed is expressly provided by § 32: "Any person or organization who makes such declaration knowing it to be false is guilty of a felony." The majority relies heavily on the duty of the assessor to "[investigate] the facts underlying all tax liabilities," as well as his subpoena power incident thereto under § 454 of the California Tax Code. But the California court adverts to those matters only under a hypothetical state of facts, namely, in the absence of the aid provided by § 32. 48 Cal. 2d, at 430–432, 311 P. 2d, at 515. The essential point is that, whatever the assessor's duty, § 32 provides for its discharge on the basis of the declarations alone.

On the other hand, if it be thought that the Supreme Court of California is ambiguous on this matter, then it is well established that our duty is to so construe the state oath as to avoid conflict with constitutional guarantees of due process. *Garner* v. *Board of Public Works,* 341 U. S. 716, 723–724 (1951); *Gerende* v. *Board of*

*Supervisors of Elections,* 341 U. S. 56 (1951). Two years ago we construed filing of the non-Communist affidavit required by § 9 (h) of the National Labor Relations Act as being conclusive in character, holding that the criminal sanction provided in that section was the exclusive remedy for the filing of a false affidavit. *Leedom* v. *International Union of Mine, Mill & Smelter Workers,* 352 U. S. 145 (1956). That Act bars issuance of a complaint or conducting an investigation upon the application of a union unless the prescribed non-Communist affidavit is filed by each officer of the union. Article XX, § 19, of the California Constitution expressly prohibits a tax exemption to any person or organization that advocates violent overthrow of either the California or the United States Governments, or advocates the support of a foreign government against the United States in the event of hostilities, and provides for legislative implementation thereof. By § 32 the California Legislature has required only the filing of the affidavit. The terms of § 9 (h) of the National Labor Relations Act and § 32 of the California Tax Code, therefore, establish identical procedures. That identity points up the inappropriateness of the Court's construction of § 32.

Even if the Court's interpretation of California law is correct, I cannot agree that due process requires California to bear the burden of proof under the circumstances of this case. This is not a criminal proceeding. Neither fine nor imprisonment is involved. So far as Art. XX, § 19, of the California Constitution and § 32 of the California Tax Code are concerned, appellants are free to speak as they wish, to advocate what they will. If they advocate the violent and forceful overthrow of the California Government, California will take no action against them under the tax provisions here in question. But it

will refuse to take any action *for them,* in the sense of extending to them the legislative largesse that is inherent in the granting of any tax exemption or deduction. In the view of the California court, "An exemption from taxation is the exception and the unusual. . . . It is a bounty or gratuity on the part of the sovereign and when once granted may be withdrawn." 48 Cal. 2d, at 426, 311 P. 2d, at 512. The power of the sovereign to attach conditions to its bounty is firmly established under the Due Process Clause. Cf. *Ivanhoe Irrigation District* v. *McCracken,* 357 U. S. 275, 295 (1958). Traditionally, the burden of qualifying rests upon the one seeking the grace of the State. The majority suggests that traditional procedures are inadequate when "a person is to suffer a penalty for a crime." But California's action here, declining to extend the grace of the State to appellants, can in no proper sense be regarded as a "penalty." The case cited by the majority, *Lipke* v. *Lederer,* 259 U. S. 557 (1922), involves an altogether different matter, imposition of a special tax upon one who engaged in certain illegal conduct, by a statute that described the levy as a "tax *or penalty."* (Emphasis added.) 259 U. S., at 561.

The majority, however, would require that California bear the burden of proof under the circumstances of this case because "the transcendent value of speech is involved." This is a wholly novel doctrine, unsupported by any precedent, and so far as I can see, inapposite to several other decisions of this Court upholding the application of similar oaths to municipal employees, *Garner* v. *Board of Public Works,* 341 U. S. 716 (1951); public school teachers, *Adler* v. *Board of Education,* 342 U. S. 485 (1952); candidates for public office, *Gerende* v. *Board of Supervisors,* 341 U. S. 56 (1951); and labor union officials, *American Communications Assn.* v. *Douds,* 339

U. S. 382 (1950). See also *Davis* v. *Beason,* 133 U. S. 333 (1890), as to voters in territorial elections. All of those decisions, by virtue of the oath involved, put the burden on the individual to come forward and disavow activity involving "the transcendent value of speech." The majority attempts to distinguish them on the basis of their involving a greater state interest in justification of restricting speech, and also on the ground that the oaths there involved were conclusive in nature. The first distinction, however, seems pertinent only to the validity of an oath requirement in the first place, not to burden of proof under such a requirement. The second distinction, which *arguendo* I accept as true at this point, seems exceedingly flimsy, since even an oath that is conclusive in nature forces the applicant to the burden of coming forward and making the requisite declaration. So far as impact on freedom of speech is concerned, the further burden of proving the declarations true appears close to being *de minimis.*

The majority assumes, without deciding, that California may deny a tax exemption to those in the proscribed class. I think it perfectly clear that the State may do so, since only that speech is affected which is criminally punishable under the Federal Smith Act, 18 U. S. C. § 2385, or the California Criminal Syndicalism Act, Cal. Stat., 1919, c. 188. And California has agreed that its interpretation of criminal speech under those Acts shall be in conformity with the decisions of this Court, *e. g., Yates* v. *United States,* 354 U. S. 298 (1957); *Dennis* v. *United States,* 341 U. S. 494 (1951); *Whitney* v. *California,* 274 U. S. 357 (1927). The interest of the State that justifies restriction of speech by imposition of criminal sanctions surely justifies the far less severe measure of denying a tax exemption, provided the lesser sanction bears reasonable relation to the evil at which the State

aims. Cf. *American Communications Assn.* v. *Douds, supra.* The general aim of the constitutional and legislative provisions in question is to restrict advocacy of violent or forceful overthrow of State or National Government; the particular aim is to avoid state subsidization of such advocacy by refusing the State's bounty to those who are so engaged. The latter has been denominated the "primary purpose" by the California Supreme Court. 48 Cal. 2d, at 428, 311 P. 2d, at 513. In view of that, reasonable relation is evident on the face of the matter.

Refusal of the taxing sovereign's grace in order to avoid subsidizing or encouraging activity contrary to the sovereign's policy is an accepted practice. We have here a parallel situation to federal refusal to regard as "necessary and ordinary," and hence deductible under the federal income tax, those expenses deduction of which would frustrate sharply defined state policies. See *Tank Truck Rentals, Inc.,* v. *Commissioner,* 356 U. S. 30 (1958).

If the State's requirement of an oath in implementing denial of this exemption be thought to make an inroad upon speech over and above that caused by denial of the exemption, or even by criminal punishment of the proscribed speech, I find California's interest still sufficient to justify the State's action. The restriction must be considered in the context in which the oath is set—appeal to the largesse of the State. The interest of the State, as before pointed out, is dual in nature, but its primary thrust is summed up in an understandable desire to insure that those who benefit by tax exemption do not bite the hand that gives it.

Appellants raise other issues—pre-emption of security legislation under *Pennsylvania* v. *Nelson,* 350 U. S. 497 (1956), and denial of equal protection because the oath is not required for all types of tax exemptions—which the majority does not pass upon. I treat of them only so far

as to say that I think neither has merit, substantially for the reasons stated in the opinion of the Supreme Court of California.

If my interpretation of § 32 is correct, I assume that California will afford appellants another opportunity to take the oath, this time knowing that its filing will have conclusive effect. For the reasons stated above, I would affirm the judgment.