[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION TO DISMISS
The defendant, Steven T. Washburn, was arrested on January 17, 1992, on or about 1:38 a.m., for operating a motor vehicle while under the influence of alcohol pursuant to General Statutes Section14-227a.
Upon failing to perform a series of standardized field sobriety tests to standard, the defendant was arrested and transported to the New Milford Police Department, where the results of two Intoximeter tests revealed a descending blood alcohol content of .124 and .114.
The defendant's driver's license was revoked administratively for a twenty-four hour period pursuant to General Statutes Section14-227b(c). The defendant was given a temporary license pursuant to the statute which did not become effective until after the twenty-four hour suspension expired.
Within the above mentioned twenty-four hour period, the defendant was stopped in his vehicle by a police officer for an unrelated offense. No ticket was issued at that time and the defendant was allowed to continue driving. Subsequently, the New Milford Police Department discovered that the twenty-four hour revocation period had not expired at the time of the stop. An arrest warrant was issued on March 2, 1992, for the defendant, for driving while his license was revoked in violation of General CT Page 10898 Statutes Section 14-215(c).
The defendant's motion to dismiss was filed pursuant to Practice Book Section 815, which states, in pertinent part, that a "claim that the law defining the offense charged is unconstitutional or otherwise invalid" is properly raised by a motion to dismiss. Practice Book Section 815.
In his motion to dismiss the defendant contends that General Statutes Section 14-227b(c) is unconstitutional because it constitutes a bill of attainder which violates the Bill of Attainder Clause of the U.S. Constitution, specifically, art. I, sect. 10, cl. 1. The state, in its memorandum in opposition to the motion to dismiss, contends that the statute is constitutional.
The United States Constitution contains two bills of attainder clauses — one that applies to federal government, U.S. Const. art. I, sect. 9 cl. 3 which states "No Bill of Attainder . . . shall be passed." And one that applies to the states, U.S. Const. art. I, sect. 10, cl. 1 which states "No State shall . . . pass any Bill of Attainder."
The bill of attainder provision prohibits the state legislature from assuming judicial functions and conducting trials. United States v. Brown, 381 U.S. 437, 14 L.Ed.2d 484 (1965). Consequently, the clauses proscribe any legislative act "no matter what [its] form, that apply[s] either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without judicial trial." United States v. Lovett, 328 U.S. 303, 315, 90 L.Ed. 1252 (1946). See also American Communications Ass'n v. Douds, 339 U.S. 382, 94 L.Ed. 925, rehearing denied, 339 U.S. 990 (1950) (punishment must be punitive rather than preventive).
Because any legislative act which employs a classification might be said to burden or punish the class of persons who do not receive the benefits established by the legislation or who are disadvantaged by the classification, the United States Supreme Court has developed various tests to determine when the law inflicts prohibited punishment: The mere fact that a law imposes burdensome consequences does not mean that there is the forbidden "punishment." Rather, the courts must determine first, whether the law imposes a punishment "traditionally judged to be prohibited by the Bill of Attainder Clause." Nixon v. Administrator of General Services, 433 U.S. 425, 475, 53 L.Ed.2d 867, 911 (1977). Such CT Page 10899 historical punishments include "imprisonment, banishment, and the punitive confiscation of property by the sovereign, [and] a legislative enactment barring designated individuals or groups from participation in specified employments or vocations, a mode of punishment commonly employed against those legislatively banded as disloyal." Nixon, supra, 474, 53 L.Ed.2d at 910-11.
Second, in addition to this historical test, the United States Supreme Court has developed a functional test: can the law reasonably be said to further nonpunitive goals, given the type and severity of the burdens imposed. Nixon, supra, 475.
Third, the Court can look to the legislative motivation: does the legislative record evidence a congressional intent to punish. Nixon, supra, 478. For purpose of this test the Court looks to the legislative record and floor debates. It also examines the features of the law under challenge to see if that law demonstrates any punitive interpretation.
Fourth, the United States Supreme Court has found it "often useful to inquire into the existence of less burdensome alternatives by which [the] legislature could have achieved its legitimate objectives." Nixon, supra, 482. The Court determines whether the legislative judgment is "rational and fair minded." Id.
In order for General Statutes Section 14-227b(c) to be constitutional it must satisfy these tests. However, since the historical test is not applicable to the present case the other three tests will be reviewed.
First, Section 14-227b(c) is civil or regulatory in nature and does not constitute punishment for a crime. The statute is designed more to protect the public from the dangers of, and tragedies caused by intoxicated drivers than it is to punish the intoxicated driver. Moreover, the statute on its face does not single out any individual or easily ascertained members of a group, since the statute applies to all licensed drivers who use the highway. The statute does not identify, implicate or isolate by creating a subsection or smaller identifiable group within the general population of licensed drivers to be suspended.
Second, the legislative intent of the statute is to protect the public from the dangers of the intoxicated driver. Although portions of the legislative history refer to the bill as a penalty a reading of the entire legislative history places the purpose and CT Page 10900 intent of the Statute in perspective. This legislation was designed to help prevent senseless and tragic deaths and injuries caused by those who operate motor vehicles while under the influence of alcohol and reaffirm Connecticut's commitment to keep the drunk and impaired motorist off the highways. See Senate bill 308, Senate Proceedings, May 4, 1982; House Proceedings, May 4, 1982. Thus, it is clear that the governmental function involved here, is the state's compelling and legitimate interest in public safety.
Third, there does not appear to be less burdensome alternatives. The driver receives a temporary license after the twenty-four hour period expires. The other alternative which this court considers to be more burdensome is to suspend the license until a hearing is requested or required within a specified time period as is done in other states and is upheld by the U.S. Supreme Court. For instance, in Mackey v. Montrym, 443 U.S. 1 (1978) the Massachusetts statute provided for a ninety-day suspension and in Dixon v. Love, 431 U.S. 105 (1977), the Illinois statute and regulations allowed suspension for as long as a year and even allowed for the possibility of indefinite revocation. It is true that the Massachusetts statute, unlike the Connecticut statute, provided for an immediate hearing. That hearing, however, could only take place after the driver requested it and after the suspension had occurred. Although the Illinois system contained a hardship provision, the date for a post-suspension hearing did not have to be set until twenty-days after a written request for the hearing by the driver. In contrast, the Connecticut statute reinstates driving privileges within twenty-four hours. Thus, by the time any post suspension review could possibly be administered the petitioner would have already had his or her driving privileges reinstated, rendering a post suspension review moot.
Since General Statutes Section 14-227b(c) is not a bill of attainder the issue of whether the twenty-four hour suspension of a driver's license violates due process of law must be addressed. While the issue here appears to be a case of first impression in regard to General Statutes Section 14-227b(c), the United States Supreme Court has had occasion to rule on the summary revocation by a state of its citizen's drivers license. In Bell v. Burson,402 U.S. 535 (1970), the Court considered Georgia's Motor Vehicle Safety Responsibility Act and found it unconstitutional, "since the statutory scheme makes liability an important factor in the State's determination to deprive an individual of his licenses, the State may not, consistent with due process, eliminate consideration of that factor in its prior hearing." Bell, supra, 541. However, as CT Page 10901 applied to the present case, two other conclusions of the Court are particularly relevant. First, the Court held that licenses may not be confiscated without procedural due process:
 Once licenses are issued, as in petitioner's case, their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment. Sniadach v. Family Finance Corp., 395 U.S. 337, 23 L.Ed.2d 349, 89 S.Ct. 1820 (1969); Goldberg v. Kelly, 397 U.S. 254, 25 L.Ed.2d 287, 90 S.Ct. 1011 (1970). This is but an application of the general proposition that relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a "right" or a "privilege." Sherbert v. Verner, 374 U.S. 398, 10 L.Ed.2d 965, 83 S.Ct. 1790 (1963) (disqualification for unemployment compensation); Slochower v. Board of Education, 350 U.S. 551, 100 L.Ed. 692, 76 S.Ct. 637 (1956) (discharge from public employment); Speiser v. Randall, 357 U.S. 513, 2 L.Ed.2d 1460, 78 S.Ct. 1332 (1958) (denial of a tax exemption); Goldberg v. Kelly, supra (withdrawal of welfare benefits). See also Londoner v. Denver, 210 U.S. 373, 385-386, 52 L.Ed. 1103, 1112, 28 S.Ct. 708 (1908); Goldsmith v. Board of Tax Appeals, 270 U.S. 117, 70 L.Ed. 494, 46 S.Ct. 215
(1926); Opp Cotton Mills v. Administrator, 312 U.S. 126
(1941).
Bell, supra, 539.
Secondly, the Court held that in providing procedural due process the revocation hearing must occur prior to the suspension.
The Court stated:
 Finally, we reject Georgia's argument that it must afford the licensee an inquiry into the question of liability, that determination, unlike the determination of the matters presently considered at the administrative hearing, need not be made prior to the suspension of licenses. While "many controversies have raged about . . . the Due Process Clause." Ibid., it is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate an CT Page 10902 interest such as that here involved, it must afford "notice and an opportunity for hearing appropriate to the nature of the case" before termination becomes effective. Ibid. Opp Cotton Mills v. Administrator, 312 U.S. at 152-156; Sniadach v. Family Finance Corp., supra; Goldberg v. Kelly, supra; Wisconsin v. Constantineau, 400 U.S. 433
(1971).
Bell, supra, 542.
These holdings were reaffirmed in Fuentes v. Shevin, 407 U.S. 67
(1972). In Fuentes the Court further explained the concept of "emergency situations" in which due process had not been required.
 There are "extraordinary situations" that justify postponing notice and opportunity for hearing. Boddie v. Connecticut, 401 U.S. [371], at 379. These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a governmental official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. Thus, the Court has allowed summary seizure of property to collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, and to protect the public from misbranded drugs and contaminated food. (Footnotes omitted).
Fuentes, supra, 90-92. Thus, it appears that if an "important interest", such as driver's licenses, as it had been characterized in Bell v. Burson, is to be taken from the licensee, then, except in extraordinary circumstances, procedural due process necessitates that the person whose interest is in jeopardy be afforded an opportunity to be heard prior to the taking.
The application of Bell v. Burson, supra, to the facts of the present case results in the conclusion that Connecticut's implied consent statute, namely General Statutes Section 14-227b(c) CT Page 10903 survives this constitutional challenge because it meets the requirements of an "emergency situation", justifying summary revocation of an operator's license upon the finding of a blood to alcohol ratio of .10 of one percent or greater or the upon the refusal to submit to a chemical test. The Connecticut statute meets the emergency requirements as enunciated in Fuentes v. Shevin, supra. There is a compelling State interest to keep drunk drivers off the road, and to get them off immediately so as to prevent senseless and tragic deaths and injuries caused by those who operate motor vehicles while under the influence of alcohol. In addition, since a party with a blood to alcohol ratio of .10 of one percent is deemed by law to be driving while intoxicated, there is a legitimate interest in keeping that person from future use of the highway. As the U.S. Supreme Court stated in Mackey v. Montrym,443 U.S. 1 (1978):
 The Commonwealth's interest in public safety is substantially served in several ways by the summary suspension . . . . First, the very existence of the summary sanction of the statute serves as a deterrent to drunk driving. Second, it provides strong inducement to take the breath-analysis test and thus effectuates the Commonwealth's interest in obtaining reliable and relevant evidence for use in subsequent criminal proceedings. Third, in promptly removing such drivers from the road, the summary sanction of the statute contributes to the safety of public highways.
Mackey, supra, 18.
There is also a need for very prompt action because the release of an intoxicated person who then operates a motor vehicle presents a danger to himself or others. The protection to the public afforded by the twenty-four hour suspension is less violative of due process than a requirement to maintain an arrested person in a custodial situation until sobriety is reached. There, serious liberty interests would be affected. Finally, the person initiating the seizure is a "governmental official" (a law enforcement officer).
Based on the foregoing, the defendant has failed to sustain his burden that the lack of a presuspension hearing is violative of due process and is not an "emergency situation" as espoused in Bell, and its progeny. Therefore, this court declines the opportunity to declare General Statutes Section 14-227b(c) unconstitutional. Accordingly, the defendant's motion to dismiss is CT Page 10904 denied.
DRANGINIS, J.