The **ALAN GUTTMACHER INSTITUTE; Richard Udry, Ph.D.; Larry Bumpass, Ph.D.; Charles F. Westoff, Ph.D.; John G. Kantner, Ph.D.; Ronald Freedman, Ph.D.; and Samuel Preston, Ph.D., Plaintiffs,**

v.

**M. Peter McPHERSON, Administrator of the Agency for International Development (AID) and Director of the International Development Cooperation Agency; Jay Morris, Deputy Administrator for AID; Richard R. Miller, former Chairman of the Communications Review Board for AID, and his successor in office; and Walter Rockwood, Mary Beth Bloomberg, Dee Ann Smith, Kate Semerad, Don Thieme, Doug Trussell, and Beth Hogan, members of the Communications Review Board of AID, and their successors in office; George P. Shultz, Secretary of State; David A. Stockman, Director of the Office of Management and Budget, Defendants.**

No. 83 Civ. 4461–CSH.

United States District Court,
S.D. New York.

June 17, 1985.

Suzanne M. Lynn, Janet Benshoof, Nan D. Hunter, Verna C. Sanchez, Burt Neuborne, American Civil Liberties Union Foundation, Samuel Whitney Seymour, John L. Hardiman, Arthur Eisenberg, Steven Shapiro, Madeline Kochen, New York Civil Liberties Union, New York City, for plaintiffs; William Josephson, Fried, Frank, Harris, Shriver & Jacobson, New York City, Lawrence R. Sidman, Fried, Frank, Harris, Shriver & Kampelman, Washington, D.C., of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendants; Denny Chin, Asst. U.S. Atty., New York City, Stephen L. Wilson, Atty. Advisor, Office of the General Counsel, Agency for Intern. Development, Robert M. Wolff, Atty., Civ. Div., Federal Programs Branch, Dept. of Justice, Washington, D.C., of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

As originally filed, this action challenged the decision of the Agency for International Development ("AID") not to renew a funding grant for a journal, *International Family Planning Perspectives* ("Perspectives"), published by plaintiff The Alan Guttmacher Institute ("the Institute"). In a Memorandum Opinion and Order of November 27, 1984, reported as *Alan Guttmacher Institute v. McPherson*, 597 F.Supp. 1530 (S.D.N.Y.1984) (*"Guttmacher I"*), I dismissed some of the Institute's claims for relief and all of those of the individual plaintiffs. Defendants now move pursuant to Rules 12(b)(1) and (6), Fed.R.Civ.P., for dismissal of all remaining claims. The Institute, the remaining plaintiff, cross-moves under Rule 15(a), Fed.R. Civ.P., to amend its complaint to add a constitutional challenge to certain amendments of the Foreign Assistance Act of 1961 ("FAA"), the Act under which the *Perspectives* funding was originally provided.

*Factual Background*

A full exposition of the allegations in the original complaint is provided in *Guttmacher I*, 597 F.Supp. at 1532–1533. For clarity I will summarize the claims here.

From 1974 through early 1983, *Perspectives,* a journal publishing articles and information in the field of international population control and family planning, received

substantial funding from AID. In December, 1982, the Communications Review Board ("CRB") of AID announced the results of a review of the funding of *Perspectives*. The review was undertaken pursuant to a directive issued by defendant David Stockman, head of the administration's Office of Management and Budget ("OMB"). The directive, OMB Bulletin No. 81–16, instructed federal agencies to review the content of federally-funded publications and to eliminate those found "duplicative and wasteful." In a section on implementing the directive, it was suggested that one factor which the agencies could consider in deciding whether a publication's funding was wasteful was whether the publication "reflects agency and Administration goals and priorities."

CRB found *Perspectives* unnecessary and recommended termination of its AID grant. CRB's recommendation, according to an AID memorandum, turned upon findings that *Perspectives* was economically unjustified and that two articles it had published could be construed as advocating abortion. The recommendation was accepted.

Plaintiff alleges that both of these findings are false and pretextual. It alleges that funding for *Perspectives* was actually denied in an effort to suppress the publication of neutral information about abortion and to punish the Institute for its activities concerning abortion in fora other than *Perspectives*. Five causes of action were asserted in the original complaint, of which three remain:

First cause of action: in terminating funding for *Perspectives* because its publisher espoused ideas in other fora with which the administration disagrees, defendants violated the Institute's First Amendment rights.

Second cause of action: in terminating funding for *Perspectives* because it published accurate reportage, defendants "engaged in content-based discrimination in vi-

olation of the First and Fifth Amendments."

Third cause of action: in terminating the funding for *Perspectives* defendants violated the FAA.

Plaintiff seeks, *inter alia*, a declaration that certain AID policies are unlawful and an injunction securing lawful consideration of the *Perspectives* grant request.

Following the *Guttmacher I* decision, the government offered to settle this action by conducting a second CRB review of *Perspectives*. In order to avoid plaintiff's objections to the initial review, the government offered not to consider in making its decision either the Institute's activities outside *Perspectives* or the two articles which caused CRB to accuse *Perspectives* of advocating abortion. Because plaintiff rejected the offer, defendants now move for dismissal, claiming that their willingness to agree to this relief moots the action. Alternatively, they contend that the second and third causes of action should be dismissed for failure to state a claim on which relief may be granted. As noted, plaintiff cross-moves to amend its complaint to assert a new cause of action.

I shall first deal with the government's motion to dismiss the three surviving causes of action from the original complaint. The proposed amended complaint is considered separately.

*Mootness*

The government has agreed to have CRB reconsider the *Perspectives* grant. In order to eliminate the possibility that CRB's decision will be tainted by a motive to suppress other activities of the Institute, under the proposal CRB will not be permitted to take these activities into account in reevaluating *Perspectives*. In addition, in reviewing the acceptability of the journal's content, CRB proposes not to consider the two articles which it found objectionable because of their approach to abortion.[1] The government argues that because this reconsideration constitutes all of the relief

---

1. In addition, in order to avoid the problem discussed in *Guttmacher I*, 597 F.Supp. at 1546–ed as a continuing, rather than a new, grantee.

47, defendants consent to considering plaintiff as a continuing, rather than a new, grantee.

which the Institute could secure after a trial on the merits, its willingness to consent to the relief moots the action.

■ The doctrine of mootness grows out of the constitutional limitation of the power of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2; *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 104 S.Ct. 373, 374, 78 L.Ed.2d 58 (1983) (per curiam). Article III restricts federal court jurisdiction to those cases which present a dispute which admits of relief which would have a present impact on the legal relations of the parties. The contrast is with cases which present a hypothetical conflict which, while perhaps foreseeable, has not yet become imminent. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979).

■ It is clear that a present controversy existed at the inception of this action. Defendants contend, however, that by offering to grant plaintiff all of the relief to which it is entitled they have mooted the action. In theory, they are correct. If a defendant consents to entry of a judgment embodying all of the relief to which a plaintiff is entitled, it is hard to imagine how a justiciable controversy remains. Whatever conflict the plaintiff might continue to perceive will be conflict as to which the court can render no effective, present relief. *See Iron Arrow Society, supra*, 104 S.Ct. at 375. Nor does plaintiff contest this general principle of law; rather, the Institute argues that it is entitled to greater relief than that which has been offered by defendants.

This objection, however, does not apply to all claims. Plaintiff does not appear to contest that defendants' offer would constitute the whole of the relief to which it is entitled under the first cause of action, which alleges retaliation for Institute activities in other fora. Defendants concede that had they in fact had retaliatory motives, they would have acted unlawfully. Upon proving retaliation, however, plaintiff would not have been entitled to an immediate award of grant money but, at least in the first instance, only a fair non-retaliatory consideration of its request by CRB. *See Guttmacher I*, 597 F.Supp. at 1543. This is what CRB is offering, and the government's consent to such relief would moot litigation of this cause of action.

The second and third causes of action stand on a different footing. Both allege that *Perspectives* was denied funding because it published neutral information on the incident, extent, and consequences of abortion. The second cause of action asserts that this violated the First and Fifth Amendments to the Constitution; the third asserts that it violated the FAA. Defendants have not acknowledged that such actions would be unlawful, as they have regarding the behavior alleged in the first cause of action, nor have they consented not to engage in the practice. Instead they have offered not to consider the specific articles to which CRB raised objections during the 1982 review. It presumably has not escaped defendants' notice that this offer leaves them free to consider any similar articles *Perspectives* may have published before or since that time.

Defendants claim that "the principal issue presented by the second and third causes of action is whether the [two articles] advocated abortion," as CRB claimed in its review. If the issue were so restricted, defendants' offer might moot the claims. It is not. Plaintiff's factual claim is not simply that defendants mistook these neutral articles as advocacy. It is that defendants recognized this neutrality and intentionally terminated the funding because they wished to prevent the dissemination of non-pejorative information regarding abortion. If the factual claim is proven, it must then be determined, under plaintiff's theory, whether the refusal to fund for that reason was lawful. Plaintiff seeks to prevail on both its factual and legal claims, not only to regain the funding it has lost, but to assure itself that future non-pejorative discussions of abortion will not place future funding in jeopardy.

This discussion makes it clear that defendants have not offered sufficiently com-

plete present relief to moot plaintiff's claims. Although defendants offer not to consider the two past articles pinpointed by CRB as supporting the allegations of advocacy in its review, they have not disavowed the alleged underlying policy of defunding on the basis of the publication of neutral information about abortion. Pursuant to their proffered agreement, they could consider other similar articles and refuse to renew the grant for the same allegedly unlawful reason following the second review. Not only is this a result which would not occur if plaintiff prevailed on the merits of its second or third causes of action, it is the primary result which this lawsuit seeks to forestall. Under these circumstances, it can hardly be said that defendants' offer provides plaintiff all of the relief to which it is entitled.

Nor does the offer, as defendants argue, reduce a pronouncement on the legality of the alleged reason for defunding to the status of an advisory opinion. An advisory opinion constitutes a decision of law concerning a set of facts which are hypothetical or speculative, facts which do not now exist and whose existence is not imminent. *See Babbitt v. United Farm Workers, supra,* 442 U.S. at 298, 99 S.Ct. at 2308, *quoting Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 664, 67 L.Ed. 1117 (1923) (" '[o]ne does not have to await the consummation of threatened injury.... If the injury is certainly impending that is enough.' "). The consented relief makes it a certainty that CRB will once again review *Perspectives,* and because CRB has not disavowed its alleged actions (although, of course, it denies having taken them) and *Perspectives* has not disavowed the publication of neutral articles concerning abortion, it seems more than likely that the threatened harm will recur even if the prior offending articles are ignored.

Even if this offer did constitute all the relief to which plaintiff is presently entitled, I am inclined to think that it would not render the action non-justiciable. It has been held, for example, that voluntary cessation of challenged illegal conduct by a defendant will not moot an action challenging that conduct unless " 'there is no reasonable expectation that the wrong will be repeated.' " *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953), *quoting United States v. Aluminum Co. of America,* 148 F.2d 416, 448 (2d Cir.1945). Although this principle was enunciated in the context of a civil action brought by the government to challenge alleged unlawful conduct, a circumstance in which the arguments against a finding of mootness are particularly strong, a similar principle has been applied in private civil actions which have been mooted by a disappearance of the underlying conflict. *See Vitek v. Jones,* 445 U.S. 480, 487, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552 (1980). If the challenged action constitutes a "fixed and definite" public policy which will be invoked whenever a relatively short-lived phenomenon recurs, it has been held that the disappearance of the phenomenon does not moot the controversy over the lawfulness of the policy if the phenomenon is likely to recur. *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 124, 94 S.Ct. 1694, 1699, 40 L.Ed.2d 1 (1974). This is a variation of the familiar "capable of repetition, yet evading review" exception to the mootness doctrine. *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 319 (1911). Plainly if defendants could moot a challenge to their alleged policy simply by agreeing to ignore whatever articles they relied on previously, they could apply the policy endlessly on the basis of new articles, yet perennially avoid a decision on its legality. As the above cases illustrate, this cannot be permitted.

Because I find that the offered relief would moot only the first, but not the second or third,[2] causes of action, it is necessary to consider defendants' legal

---

**2.** Plaintiff also argues that the new cause of action in its proposed amended complaint would not be mooted by this relief. Because of

my disposition of the mootness argument concerning the second and third causes of action, there is no point in reaching this claim.

challenges to the sufficiency of the second and third causes of action.

*Second Cause of Action*

Defendants have moved to dismiss the second and third causes of action for failure to state a claim on which relief can be granted. As noted, the second cause of action alleges that CRB denied *Perspectives* funding because it published neutral articles on abortion and that this constituted "content-based discrimination," allegedly in violation of the First and Fifth Amendments.

Defendants argue that the decision not to fund a publication because of its content raises no First Amendment issues, for "the Constitution imposes no obligation on the Government to subsidize the exercise of free speech." (Defendants' Moving Brief, at 16). Plaintiff responds that "[w]hile it is true that the Constitution does not obligate the government to subsidize First Amendment activity, it is equally true that the government cannot withhold a benefit because of First Amendment activity." (Plaintiff's Moving Brief, at 16).

Before plunging into an analysis of these claims, it will be helpful to review the factual allegations which underlie the cause of action. The statute under which *Perspectives* was funded, 22 U.S.C. § 2151b(b), gives the President discretion to distribute funds to assist "voluntary population planning," including money for "the provision of family planning information and services" and "the conduct of relevant demographic research." The only statutory restraint on the expenditure of FAA funds in relation to abortion is found in § 2151b(f), which forbids expenditures for the performance, motivation, or coercion of abortion and for biomedical research on abortion. The parties have not pointed to any

AID regulations which expand on this provision. However, 41 C.F.R. § 7–7.5003–3(b) (1984) contains a clause which is required to be inserted into "all contracts involving any aspect of family planning and population assistance activities" which limits its abortion-related work. It is likely that this clause was inserted into the *Perspectives* grant, although the parties have not confirmed this.[3] The relevant subsection of § 7–7.5003–3 prohibits use of FAA funds to finance:

(i) Procurement or distribution of equipment intended to be used for the purposes of inducing abortions as a method of family planning; (ii) special fees or incentives to women to coerce or motivate them to have abortions; (iii) payments to persons to perform abortions or to solicit persons to undergo abortions; (iv) information, education, training, or communication programs that seek to promote abortion as a method of family planning; (v) any biomedical research which relates, in whole or in part, to methods of, or the performance of, abortions or involuntary sterilization as a means of family planning (epidemiologic or descriptive research to assess the incidence, extent or consequences of abortion is not precluded); or (vi) lobbying for abortion.

41 C.F.R. § 7–7.5003–3(b)(1) (1984).[4] The clause does not appear to put any restrictions on the use of FAA funds to finance the publication of journal articles about abortion, whatever their tone. While it does prohibit "information ... *programs* that seek to promote abortion" (emphasis added), an informational program is quite different from the simple publication of information, for "program" implies not only the publication of information but an

3. If the clause was not contained in the *Perspectives* grant, the following analysis would not be substantially changed, but it would be strengthened for plaintiff. Because the clause limits abortion-related expenditures, plaintiff might have assumed that its absence from the *Perspectives* grant indicated that AID did not choose to apply those restrictions to *Perspectives'* work.

4. The 1984 version of § 7–7.5003–3(b)(1) differs slightly from the version which probably would have been incorporated in the *Perspectives* grant, for the regulation was amended in mid-1982. The primary change was the addition of subsection (v) and (vi). None of the changes are material to the issues at hand. *Compare* 43 Fed.Reg. 15,627 (1978) with 47 Fed.Reg. 25,965–66 (1982).

active effort to distribute the information with the express and singular purpose of promoting abortion.

One of CRB's stated reasons for defunding *Perspectives* was that *Perspectives* published articles tending to promote abortion. CRB did not claim that such an activity violated any statute or regulation or the contract clause. Rather, it simply found the articles to be at odds with AID policy. When pressed, CRB could allegedly find only two offending articles. Plaintiff asserts that these articles contain neutral information about the incidence and extent of abortion. Such information would appear to be expressly permitted by the parenthetical clause of 41 C.F.R. § 7–7.5003–3(b)(1)(v), quoted above. Plaintiff alleges that the real motive for CRB's action was to implement a policy of suppressing all non-pejorative information about abortion so as "to promote the belief that abortion is wrong." Proposed amended complaint, at ¶ 32. It is this action, in pursuance of this policy, which plaintiff alleges as a violation of First and Fifth Amendment rights.

▮ It is clear that not all content-based discrimination by the government is unlawful. Agencies are plainly entitled to take the content of a journal into consideration when deciding whether to fund it, or continue to do so. It cannot be contended, for example, that the government cannot terminate funding for a journal which publishes shoddy, unoriginal, or duplicative research. Nor is the government precluded from deciding that journals directed at certain scientific or public policy concerns are more worthy of support than those directed at other concerns. Whenever the government seeks selectively to subsidize expression—and because of the tremendous volume of expression, the government cannot undertake to subsidize any of it without being highly selective—it must be able to base its decision in large part on the content of the publications it chooses to aid.

Accepting this proposition does not answer the question posed by this motion, however, for plaintiff's claim, as articulated in its motion papers, is more subtle.

Plaintiff recognizes that the government may lawfully "discriminate" among publications on the basis of the quality and perceived importance of their content and their service to the goals of the statute under which they are funded. Plaintiff argues, however, that the government, having chosen to fund good quality scientific publications in the area of international family planning, may not restrict its funding to those which ignore or discourage abortion.

According to the parties, this issue falls between two lines of Supreme Court authority. On one hand—the plaintiff's—it has long been held that the government cannot constitutionally condition receipt of a benefit upon abandonment of rights of free expression, nor, in an extension of this idea, can it penalize free expression by denying benefits to those who choose to exercise their rights. This line of authority begins with the so-called "unconstitutional condition" cases. In a commonly cited example of these, *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), the Court struck down a requirement that veterans forswear advocacy of overthrow of the government before receiving an exemption from California property taxes. The Court recognized the denial of the tax exemption as a penalty for the exercise of certain forms of speech, 357 U.S. at 518, 78 S.Ct. at 1338, and held that such a penalty could not be lawfully imposed without a prior hearing. 357 U.S. at 526, 78 S.Ct. at 1342. Thus, requirement of an oath was struck down as an impermissible procedural short cut to imposition of the penalty. *Id.*

More recently, in *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Court, having abandoned the procedural analysis, held absolutely that the government could not deny employment to a teacher on the basis of his extracurricular criticism of the school administration. In so doing, the Court commented:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable govern-

mental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Such interference with constitutional rights is impermissible.

We have applied this general principle to denials of tax exemptions, unemployment benefits, and welfare payments. But, most often, we have applied the principle to denials of public employment. We have applied the principle regardless of the public employee's contractual or other claim to a job. [citations omitted]. 408 U.S. at 597, 92 S.Ct. at 2697. *See similarly, Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (state cannot deny unemployment benefits to worker forced to quit job for religious reasons); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (nonpolicy-making city employee cannot be discharged solely on the basis of political party affiliation); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1969) (similar to *Perry* ).[5]

On the other hand, as the government points out, it has also been held that while the government may not lawfully restrict freedom of speech, it may fix the terms on which it distributes money. This was essentially the Court's reasoning in upholding the provision of the Hatch Act which restricts certain types of political activity, and thus protected First Amendment activity, of state and local employees in programs receiving federal financial support. *Oklahoma v. United States Civil Service Commission,* 330 U.S. 127, 143, 67 S.Ct. 544, 553, 91 L.Ed. 794 (1947); *compare FCC v. League of Women Voters,* —— U.S. ——, 104 S.Ct. 3106, 3131 and 3131 n. *, 82 L.Ed.2d 278 (Rehnquist, J., dissenting) with *id.,* 104 S.Ct. at 3128–29 n. 27.

It has further been held that the government has no obligation to subsidize the exercise of free speech. The case most heavily relied upon by the government in this regard is *Regan v. Taxation With Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). Plaintiff in *Taxation* was an organization formed to promote its members' views of proper federal tax policy. To advance its ideas, plaintiff distributed literature, engaged in litigation, and attempted directly to influence legislation by contacting legislators, i.e., by lobbying. The Internal Revenue Code denies charitable deduction status to taxpayer contributions to organizations which engage in lobbying. Citing the unconstitutional condition cases, plaintiff claimed that the denial of this governmental benefit solely because it engaged in a form of protected expression, lobbying, violated the First Amendment. Analogizing a tax deduction to a cash grant, the Supreme Court reasoned that Congress did not deny lobbying organizations a benefit but instead refused them a subsidy. It held that Congress has no obligation to subsidize all forms of speech equally.

 The instant case, it is claimed, falls at the seam between two accepted

---

**5.** Most recently in *FCC v. League of Women Voters,* —— U.S. ——, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), which can be construed as an extension of these cases, the Court struck down a statute which prohibited public television stations receiving governmental funding from "editorializing." In its *League of Women Voters* analysis, however, the Court essentially ignored the presence of governmental funding and treated the regulation as indistinguishable from those imposed upon private broadcasters. Only Justice Rehnquist, in dissent, found a parallel—to his mind unpersuasive—with the unconstitutional condition cases such as *Speiser* and *Perry.* 104 S.Ct. at 3132 (Rehnquist, J., dissenting).

rights: the First Amendment right of individuals to express themselves free of governmental control or retribution, and the right of government not to pay for things for which it would prefer not to pay.[6] This is because both parties appear to view the question before me as whether the government can condition the receipt of AID funds on the recipient's promise not to use the money for purposes of publishing non-pejorative information about abortion—in other words, whether AID's alleged unstated policy would be lawful if implemented.[7] I find, however, that at this point in the litigation I need not reach this issue.

A difference between the refusal to fund in this case and the refusal in *Taxation With Representation* is that the latter was done pursuant to long-standing policy embodied in an unambiguous statute; the former is alleged to have been *ad hoc*. On the facts as alleged, plaintiff—in contrast to organizations denied charitable status if they lobby—had no way of knowing at the time it published the *Perspectives* articles that their publication could lead to a denial of funding.[8] The "penalty" cases such as *Perry* and *Pickering* illustrate the distinction. In both of those, teachers were allegedly fired because they expressed extra-curricular political views at odds with those of their governmental superiors. The Supreme Court held that the firings imposed an unconstitutional penalty on the teachers' exercise of First Amendment rights. It is important to understand the meaning of "penalty" here. The firings were not unlawful because the state

---

**6.** Neither right is absolute. Laws may be made regulating speech, but they must pass careful scrutiny, *see, e.g., First National Bank of Boston v. Bellotti*, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978), particularly when regulation turns not upon mode of expression but content. *Police Department of Chicago v. Mosley*, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972). Nor has the government an absolute right to regulate the speech of those to whom it offers funding. *See FCC v. League of Women Voters, supra*, 104 S.Ct. at 3128. As Justice Rehnquist recognized in *Taxation With Representation*, the leading subsidy case, subsidies cannot be manipulated with the "aim[ ] of 'suppress[ing] dangerous ideas.'" 461 U.S. at 550, 103 S.Ct. at 2003, *quoting Cammarano v. United States*, 358 U.S. 498, 513, 79 S.Ct. 524, 533, 3 L.Ed.2d 462 (1959), *quoting Speiser v. Randall, supra* 357 U.S. at 519, 78 S.Ct. at 1338, *quoting American Communication Association v. Douds*, 339 U.S. 382, 402, 70 S.Ct. 674, 685, 94 L.Ed. 925 (1950); *see also FCC v. League of Women Voters, supra*, 104 S.Ct. at 3132 (Rehnquist, J., dissenting) (regulation of speech must bear a rational relationship to subsidy and cannot be aimed at suppression of dangerous ideas).

**7.** It is a difficult question. On one hand is the Constitution's normal aversion to such clear governmental attempts to manipulate the flow of information on issues of political importance—and it cannot be denied that abortion is a highly controversial political, as well as moral, medical, and constitutional, issue. On the other is the ambiguous legal status of abortion. The Supreme Court has found a constitutionally protected right to abortion but has held that state governments may discriminate against ex-ercise of that right by denying public funds for abortion while providing them for childbirth. *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). This latter holding has led two courts to hold that governments may similarly selectively choose to withhold funds from groups which counsel abortion, despite the burden this places on protected First Amendment rights. *Planned Parenthood of Central and Northern Arizona*, 718 F.2d 938 (9th Cir.1983); *Planned Parenthood Association of Chicago v. Kempiners*, 531 F.Supp. 320, 324 (N.D.Ill.1981), *vacated and remanded*, 700 F.2d 1115 (7th Cir.1983), *on remand*, 568 F.Supp. 1490 (N.D.Ill.1983) (the latter finding no unlawful infringement of the speakers' rights but finding unlawful infringement of listeners' rights); *but see Kempiners, supra*, 700 F.2d at 1124 (opinion of Cudahy, J.) (finding an unconstitutional penalty on speakers' exercise of free expression).

**8.** Defendants have suggested that their actions were justified by 22 U.S.C. § 2151b(f)(1), which forbids the use of FAA funds for the performance, motivation, or coercion of abortion. Certainly this language gives no fair warning that it forbids publication of neutral, factual information about the use or incidence of abortion, nor could a rational interpretation of § 2151b(f)(1) construe it as forbidding the publication of such information. As recognized in the contractual clause of 41 C.F.R. § 7-7.5003(b)(1), expenditures to "motivate" abortion would entail either actual material enticements to women considering abortion or, arguably, programs of active advocacy. Indeed, that regulation expressly recognizes the permissibility of "epidemiologic or descriptive research."

can never impose the penalty of termination upon workers because of their exercise of First Amendment rights. The Hatch Act cases prove just the opposite; the government can restrict certain First Amendment rights of its employees under threat of termination. What distinguishes the *Perry* and *Pickering* firings is that they were unexpected, in the sense that at the time the teachers expressed their views they had no reason to think that such expression would subject them to the penalty of termination.[9] The analogy to the instant case is obvious. Plaintiff depended on the AID grant as much as a teacher on his or her salary; and (unlike the lobbying organization in *Taxation With Representation*) plaintiff was given no warning that the subject matter of its articles could lead to loss of the grant.

■ I conclude that, particularly in the circumstances of the case at bar, the issue of prior notice is of constitutional significance. This case involves the most sensitive area of First Amendment concern: governmental attempts to manipulate the public flow of information about controversial issues. Government cannot, consistent with free speech, craft a policy of granting or withholding subsidies which is primarily "aimed at the suppression of dangerous ideas." *Cammarano v. United States,* 358 U.S. 498, 513, 79 S.Ct. 524, 533, 3 L.Ed.2d 462 (1959); *see FCC v. League of Women Voters,* — U.S. —, 104 S.Ct. 3106, 3132, 82 L.Ed.2d 278 (Rehnquist, J., dissenting). Laws "motivated by nothing more than a desire to curtail expression of a particular point of view on controversial issues of general interest" are "the purest example" of an abridgment of free speech.

*Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 546, 100 S.Ct. 2326, 2338, 65 L.Ed.2d 319 (1980) (Stevens, J., concurring).

■ In an area of such sensitivity, at the very least the government is obligated to state in advance the restrictions on speech which it seeks to exact as a condition for the receipt of benefits. Such a prospective declaration lets the citizens know where they stand. They may forego the speech and accept the benefits; or forego the benefit and indulge in the speech; or press a claim that the condition is unconstitutional. The latter point is of particular importance, for the urgency of the need to protect speech from politically-inspired manipulation demands that all such attempts at regulation be exposed to democratic and constitutional testing.

■ There is an additional reason why the government must give fair, unambiguous warning if it seeks to impose a restriction on First Amendment rights in return for the grant of a benefit. As *Perry* and *Pickering* illustrate, it is of paramount importance that the receipt of governmental benefits not compromise the right of citizens freely to express their views. There is no better way to stifle such expression, particularly regarding controversial topics, than to grant the government the power to declare retroactively a certain type of speech forbidden under the terms of its subsidies. In such circumstances, those dependent upon subsidies, unable to know in advance what types of speech the authorities might choose in retrospect not to subsidize, would face an impermissible choice between self-censorship and insecurity.[10] If the government is

---

9. This is not to say that the unexpectedness of the firings was the sole reason for their unlawfulness. In both, the firings were also clearly made in retaliation for the content of the speech involved. Such content-based retaliation is plainly unlawful, as the government seems to have acknowledged in the case at bar by agreeing that plaintiff's first cause of action states a valid claim.

10. Defendants seek to distinguish *Perry* and *Pickering* by characterizing their action as the

denial of a subsidy rather than imposition of a penalty. Assuming *arguendo* that defendants could constitutionally condition receipt of grant money on a promise not to publish non-pejorative articles about abortion, this fact in no way legitimizes the action challenged here. No attempt was made to condition the receipt of the funds used to publish the articles in question upon such a promise. When plaintiff published the articles it had no indication that they would jeopardize funding. Until defendants make some attempt at avoiding such a subsidy, they

required to state its restrictions in advance, on the other hand, recipients of benefits may proceed freely to express themselves without worrying that something they say may in the future become retroactively forbidden.[11]

To conclude, plaintiff alleges that the government denied it future funding because it published neutral, informational articles about abortion. None of the existing AID regulations forbid the use of grant money ·to fund such articles; on the contrary, they appear to have been expressly permitted.[12] Permitting the government in effect retroactively to prohibit such neutral articles threatens to inhibit that free expression of ideas which lies at the heart of the First Amendment. Assuming *arguendo*, for the reasons discussed in footnote 7, *supra*, that the government could force its grant recipients to curtail their coverage of abortion-related topics, it must do so only prospectively, after the journals have been given an opportunity to comply with the regulation or to challenge it judicially. Until such a regulation is promulgated, the question of its constitutionality simply does not arise.

Because the government has attempted to moot this lawsuit by consenting to the relief to which plaintiff would be entitled should it prevail, I think it appropriate to discuss the implications of this ruling upon plaintiff's potential relief. First, it is clear that in order to moot the action defendants must agree to a reconsideration of the *Perspective*'s grant during which the fact that *Perspectives* has published neutral articles on abortion will not be considered. Second, the government must concede that the two articles specifically cited by AID are neutral (or otherwise not forbidden by present regulations) and agree that they and others like them will not be considered during the grant reconsideration. Agreement to these two conditions, in addition to those already offered by defendants, would appear to moot the litigation regarding the first and second causes of action.[13]

## Statutory Claim

Plaintiffs' third cause of action is premised on their claim that the articles found objectionable by CRB consisted of neutral information about the use and incidence of abortion. They argue that such articles are affirmatively permitted under the FAA, and that defendants violated FAA by terminating funding because of their publication. Defendants move to dismiss this claim.

FAA nowhere expressly authorizes expenditures on articles discussing abortion. In fact, as noted above, it contains an express limit on the expenditure of FAA funds in connection with abortion. Sec-

---

cannot terminate funds simply because plaintiff did not anticipate their desire not to provide it.

**11.** In support of this motion, defendants cited my prior finding that the individual plaintiffs, whose claims were dismissed in the earlier decision, had no right to subsidized expression of First Amendment freedoms. *Guttmacher I*, 597 F.Supp. at 1545. Those individuals stand on an entirely different footing than the Institute regarding the First Amendment claim, since they received no funding from AID. Therefore, there is no inconsistency between the instant holding and my earlier one.

**12.** Defendants dispute plaintiff's factual characterization of the articles as neutral. CRB considered them to be advocacy. Because this is a motion to dismiss, the factual allegations in the complaint must be accepted as true. Therefore, the issue of the articles' actual stance toward abortion, whether neutral or advocacy, does not now arise. However, I note that there is a

strong argument that articles advocating abortion are forbidden by 22 U.S.C. § 2151b(f)(1).

**13.** Because of sovereign immunity constraints, see *Guttmacher I*, 497 F.Supp. at 1537–42, the relief which could be awarded against defendant Stockman must be limited under this cause of action to a declaration that the OMB Bulletin does not authorize the type of action here alleged.

Should defendants decide not to consent to the relief stated above, the case must, of course, continue to be litigated. It appears that three questions remain to which discovery must be addressed on the second cause of action: 1) whether the subject matter of the disputed articles was forbidden by existing regulations at the time of the CRB review, 2) if not, whether the publication of these articles was a causative factor in the denial of funding, and 3) if so, whether defendant Stockman's memorandum caused the CRB to consider these articles in its review.

tions 2151b(f)(1) and (3) forbid expenditures to pay for abortions, "to motivate or coerce" the practice of abortion, or to pay for abortion-related biomedical research. Defendants' argument for dismissal is relatively simple. They argue that "[t]he mere fact that Congress did not preclude funding of abortion information under Section 104(f) [22 U.S.C. § 2151b(f)] does not remotely suggest that this section *requires* AID to fund such information." Moving Brief, at 21.[14] Plaintiff responds that the issue is not whether AID must fund such information but whether it is precluded from considering the publication of such information as a reason *not* to fund. This difference, of course, is significant; the fact that AID is not required to fund publication of such information does not necessarily mean that it may use its publication as a reason not to grant funds. In this regard, plaintiff argues 1) that defendants' action is inconsistent with the general informational purpose of FAA and 2) that because the statutory history demonstrates that the above-cited restrictions on abortion-related funding were the only such restrictions Congress intended to impose, any other restrictions on abortion-related funding are contrary to the congressional purpose.[15]

Plaintiffs' first argument is that the policy allegedly adopted by AID is inconsistent with the statute's broad purpose of providing funds for the dissemination of information about methods of family planning and population control. The argument relies on 22 U.S.C. §§ 2151(a), 2151b(a), and 2151b(b). The first two are statements of congressional policy, and the last is an authorization of funding. Section 2151(a) declares that one aim of the statute is to aid less developed nations in the acquisition of "knowledge and resources essential to development." According to § 2151b(a), knowledge of methods of population control is one type of this essential knowledge, and § 2151b(b) gives the President authority to spend money to spread such knowledge. Because abortion is one effective method of population control, plaintiff argues that any policy or regulation which restricts the flow of information about abortion is inconsistent with the statutory objective of disseminating such information.

It is true, as plaintiff claims, that "in order to be valid, [regulations] must be consistent with the statute under which they are promulgated." *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *see also, United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982). However, this broad statement of law cannot be applied blindly, without sensitivity to the type of statute which the Executive is attempting to implement. Here the agency is faced with task of distributing a limited amount of funds among many potentially worthy projects, presumably far more projects than can be funded with available grants. See *Guttmacher I,* 597 F.Supp. at 1536. AID must be given broad discretionary power to create priorities to ease and objectify the job of picking and choosing among potential projects. Inevitably this means that some projects and perhaps whole classes of projects will intentionally be denied funding. In a super-

---

**14.** Defendants also argue that there is no private right of action under § 2151b. The private right of action cases, however, deal primarily with suits for damages. In contrast, this is a suit for review of an agency action. As noted in *Guttmacher I,* 590 F.Supp. at 1534, administrative agencies cannot shield their decisions from this minimal standard of review. The cases cited by defendants are either private damage suits, *e.g., Braun v. United States,* 707 F.2d 922 (6th Cir.1983), or suits by private parties to attempt to enforce statutes which are properly enforceable only by administrative agencies. *E.g., Sierra Club v. United States Army Corps of*

*Engineers,* 701 F.2d 1011, 1033–34 (2d Cir.1983). They are simply not applicable in these circumstances.

**15.** Plaintiff seeks to analogize this situation to cases presenting review of a formal agency regulation; that is, they seek to pose the issue of whether this policy, if embodied in a regulation, would be valid. In view of the limited scope of review which can be accorded a decision such as this, *see infra,* I am reluctant to hold that the analogy is a perfect one. Nevertheless, it cannot be denied that some review is available.

ficial sense, policies which implement these priorities will, by selectively excluding dissemination of information on various topics, violate the express intent of Congress to spread "knowledge." In a larger sense, however, they serve the statutory purpose by channeling limited funds to those areas which the Executive deems most deserving. Ideally, they lead to the most efficient dissemination of the most important knowledge. Thus, the mere fact that this policy results in the failure to spread a certain type of knowledge does not necessarily set it at odds with the broad informational purpose of the statute. *See, e.g., Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974) (if insufficient funds available to aid all needy Indians, Bureau of Indian Affairs may restrict aid to certain classes of Indians despite failure of statute to make distinctions among Indians to be helped).

Plaintiff's second argument cites the 1973 amendment to FAA which added § 2151b(f)(1), the subsection which prohibits the provision of funding for the performance, motivation, or coercion of abortion. Although the amendment does not expressly address the issue here at hand—provision of funding for the dissemination of neutral information about abortion—plaintiff argues that an examination of the statutory history demonstrates that the limits set by § 2151b(f)(1) were *all* the limits Congress intended to place on abortion-related funding. It claims that the majority will of Congress was to continue to make available grants for the type of neutral research and reporting alleged here.

Section 2151b(f)(1) was added to FAA in 1973 as part of a relatively comprehensive revision of the Act. The amendment adding § 2151b(f)(1) began life as the "Helms Amendment," named after its senatorial

sponsor. It passed the Senate in a somewhat broader form than that seen in the final bill, barring the use of funds "in any manner, directly or indirectly" to pay for the performance of abortions, their promotion, or research to develop methods of their performance. *See* H. Conf. R. 93–664, 93d Cong., 1st Sess., *reprinted at* 1973 U.S.Code Cong. & Ad.News 2806, 2879. The House bill contained no comparable provision. Section 2151b(f)(1) as we know it emerged from the compromise conference. According to the Conference Report, the House "receded" in consenting to the present language. *Id.* On the Senate floor, Senator Humphrey described the changes as accepted so as not "unduly [to] impair carrying out other aspects of the population planning program." 119 Cong. Rec. 39615 (December 5, 1973).[16] The 1981 amendment to FAA which added § 2151b(f)(3) barring use of funds for biomedical abortion research was similarly tailored from a more far-reaching proposed amendment. *See* 127 Cong.Rec. 89399 (December 11, 1981).

From this legislative history, plaintiff seeks to draw the conclusion that Congress did not intend AID to bar funding for the type of neutral reporting alleged here. It is this assumption which underlies plaintiff's claim that CRB's consideration of this factor was unlawful.

There is a flaw in plaintiff's logic. It must be remembered that expenditure of funds under the section of FAA at issue here is highly discretionary. *See Guttmacher I,* 597 F.Supp. at 1535. Money is to be spent "on such terms and conditions as [the President] may determine." 22 U.S.C. § 2151b(b). The effect of § 2151b(f)(1) is to limit this discretion slightly; the "terms and conditions" cannot

---

**16.** The only interpretive comment on the amendment in the official legislative history is this:

> This provision is not intended to interfere with or curtail support for preventive maternal and child health and family planning services and related research which are provided on a voluntary basis and in accordance with the prevailing local customs and medical

practice and it is not intended to apply to funds obligated prior to the date of enactment of this bill.

H.Conf.R. 93–664, 93d Cong., 1st Sess., *reprinted at* 1973 U.S.Code Cong. & Ad.News 2806, 2879–80.

It is unclear whether this is the only type of impairment to which Senator Humphrey was referring.

include motivation and performance of abortion. With that caveat, however, the Executive is free to do as it wishes. From this perspective plaintiff's logical error becomes clear. It cannot be assumed from the Congressional action in 1973 and 1981 that Congress affirmatively intended the President to accept neutral, informational abortion-related research as a necessarily proper object of § 2151b funds. All that can safely be assumed is that Congress chose not to limit his discretion regarding such research. Drawing the inference, as plaintiff does, that Congress affirmatively supported such research is simply speculation. Even if the speculation is indulged, however, and it is assumed that Congress favored such research, nothing in the legislative history of §§ 2151b(f)(1) and (3) indicates that Congress sought to remove the President's discretion under § 2151b(b) to choose not to fund it.

■■■ This observation must be viewed in the context of the court's scope of review of AID's action. As noted in *Guttmacher I*, 597 F.Supp. 1534–37, the power of the district court in reviewing that highly discretionary decision not to award a grant is limited to inquiring "whether [the] agency's reasons for acting were unconstitutional or in clear violation of a statutory mandate." 597 F.Supp. at 1434.[17] No statute bars the President from deciding not to fund neutral, informational research about abortion under FAA, nor is there any statement in the official legislative history of FAA's many amendments to that effect. Plaintiff seeks to draw that conclusion about congressional wishes from the procedural history of two amendments. This simply is not sufficient evidence of Congressional intent to permit me to find a clear violation of a statutory mandate. Undertaking the inquiry verges on the type of review of discretion which I have ruled is unavailable to plaintiff. Because there is no express statutory limitation on the type

of discretion allegedly exercised here, the third cause of action must be dismissed.

*Proposed Amendment Complaint*

In July, 1984, AID unveiled a new, multi-faceted policy toward international efforts at development. One of the facets is a new stance toward funding of abortion-related activities. According to the AID policy statement dated July 13, 1984,

> [T]he United States does not consider abortion an acceptable element of family planning programs and will no longer contribute to those of which it is a part. Accordingly, when dealing with nations which support abortions with funds not provided by the United States Government, the United States will contribute to such nations through segregated accounts which cannot be used for abortion. Moreover, the United States will no longer contribute to separate non-governmental organizations which perform or actively promote abortion as a method of family planning in other nations. With regard to the United Nations Fund for Population Activities (UNFPA), the U.S. will insist that no part of its contribution be used for abortion. The U.S. will also call for concrete assurances that the UNFPA is not engaged in abortion or coercive family planning programs; if such assurances are not forthcoming, the U.S. will redirect the amount of its contribution to other, non-UNFPA family planning programs.... U.S. Government authorities will immediately begin negotiations to implement the above policies with the appropriate governments and organizations.

Exhibit 8 to the proposed amended complaint, at 8–9.

This new statement of policy has caused plaintiff to seek to amend its complaint to add a cause of action challenging the constitutionality of 22 U.S.C. § 2151b(f)(1), the

---

**17.** The exact scope of "statutory mandate" review has never been resolved in our circuit. That such review exists has been repeatedly asserted in dictum from *Kletschka v. Driver*, 411 F.2d 436, 444 (2d Cir.1969) through *New York*

*Racing Association Inc. v. NLRB*, 708 F.2d 46, 54 (2d Cir.), *cert. denied*, 464 U.S. 914, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983), but no case has undertaken to decide how plain the statutory violation must be to justify a grant of relief.

1973 amendment to FAA which prohibits the use of FAA money to fund the performance, motivation, or coercion of abortion. According to the proposed amended complaint, AID has begun to implement its new policy by seeking to include in a grant agreement with one of AID's grantees a new clause, a copy of which is appended as Exhibit 9 to the proposed amended complaint. The grantee is a branch of Planned Parenthood which disburses funds to other groups in Latin America and the Caribbean which are active in population control efforts. The new clause would forbid the grantee from providing FAA funds to "any foreign nongovernmental organization which performs or actively promotes abortion ... in [foreign] countries." In addition, if the grantee seeks to provide funds to a domestic nongovernmental organization, the grantee must extract from the domestic organization a similar agreement concerning its fundings of foreign organizations. "To actively promote abortion" is defined by the clause as, *inter alia,* operating a family planning counseling service which provides advice about abortion, lobbying foreign governments in an effort to legalize abortion, and conducting a public information campaign publicizing the benefits or availability of abortion. It is also alleged that AID is seeking to insert a provision enforcing the policy in its direct agreements with foreign nongovernmental organizations.

The proposed amended complaint asserts "[o]n information and belief" that AID will seek to include this clause in any new agreement with the Institute concerning *Perspectives.* Plaintiff alleges that this threat deters it "from submitting any new grant proposal to AID because [the Institute] could not satisfy the new policy requirements without sacrificing the exercise of its constitutionally and statutory [sic] protected rights." Proposed amended complaint, at ¶ 40. Plaintiff challenges

§ 2151b(f)(1) because it believes that § 2151b(f)(1) is the statutory source of the new policy. The new fourth cause of action alleges that § 2151b(f)(1) is vague and overbroad; the new fifth cause of action alleges that it is unconstitutional as applied because "it has been used by the defendants to justify content-based restrictions on speech." Proposed amended complaint, at ¶ 45.[18]

The government asserts a number of reasons for denying leave to amend. Most of these I cannot accept. Because the case remains, through no fault of plaintiff, at a pre-discovery stage, I cannot see either delay or purported prejudice to the government as justifying such a denial. Nor do I believe that the amendment is, as the government contends, asserted for an "improper reason," *i.e.*, to salvage an otherwise dismissible complaint. It is clear that plaintiff views this new policy as a serious and unconstitutional threat to the freedom of its activities.

Nevertheless, I deny the motion to amend, for I find that the controversy which plaintiff alleges presents no issues which are yet ripe for judicial decision. Consider the facts alleged. This case involves in large part a dispute over articles which plaintiff claims present neutral information about abortion. Section 2151b(f), which is challenged, makes no express reference to publications at all, and neutral, essentially descriptive or demographic, information plainly is not within the scope of activities for which it outlaws funding. *See* note 8, *supra.* AID's contracts acknowledge this limit, extending the bar placed on abortion-related activity funding only to "information...programs that seek to promote abortion as a method of family planning." 41 C.F.R. § 7–7.5003–3 (1984). *Perspectives* has never expressed an interest in publishing anything other than informational articles about abortion.

---

**18.** The proposed amended complaint actually contains two types of amendments: "cosmetic" changes designed to strengthen sections of the complaint not directly related to the new causes of action and those changes which provide the factual and legal foundation for the new causes of action. The cosmetic changes, plaintiff candidly admits, are aimed at the Court of Appeals in review of my prior dismissals, and I see no reason not to permit them.

Last year, AID announced that it will no longer fund nongovernmental organizations which "actively promote" abortions in foreign countries. Neither plaintiff nor *Perspectives* claim actively to promote foreign abortions. Nearly a year later, defendants have taken no action to enforce this policy other than to attempt to include in contracts with organizations other than the Institute a provision forbidding these organizations from giving FAA funds to any foreign (not domestic, like plaintiff) nongovernmental entities which undertake various propagandizing activities regarding abortion. Defendants have taken no steps to deny funds on this ground to any domestic organization, let alone to plaintiff.

■■■■ The requirement of a "ripe" conflict is another rule of justiciably which, like the mootness doctrine, grows out of the "cases and controversies" provisions of the Constitution. A conflict becomes ripe when it has progressed far enough to be suitable for some type of judicial intervention. At a minimum, this requires a concrete factual setting which presents a realistic threat of harm to the plaintiff. In an action challenging the lawfulness of governmental action, plaintiff must allege that it "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), *quoting Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). "The injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *O'Shea, supra*, 414 U.S. 494, 94 S.Ct. 669, 38 L.Ed.2d 674, *quoting Golden v. Zwickler*, 394 U.S. 103, 109–110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969). As explained in the Supreme Court's most recent pronouncement on the topic of ripeness:

> The basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies

from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 [87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681] (1967). In *Abbott Laboratories*, which remains our leading discussion of the doctrine, we indicated that the question of ripeness turns on "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1516.

*Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Commission*, 461 U.S. 190, 200–01, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983).

■■■■ As can be concluded from the discussion of the facts above, there is no immediate danger of "direct injury." Defendants' policy does not purport to extend to neutral, informational publications, and, in any event, has not yet been applied to any domestic nongovernmental organizations. Nor is there any concrete indication that the government has the intention of doing so. On the contrary, the careful distinction drawn in the new contract clause cited by plaintiff between foreign and domestic corporations tends to indicate that AID has no present intention of extending the policy.

If plaintiff is simply afraid that it will be asked to agree to the above-quoted clause, rather than that the clause will be used to deny it funds, I fail to see the concern; plaintiff does not claim any intention of distributing funds to foreign nongovernmental organizations. It should be noted, however, that plaintiff has not even been offered an AID contract, let alone been asked to include the cited clause. There simply is no injury on the horizon; whatever exists is merely "conjectural." The mere fact that plaintiff is "chilled" in its filing of a grant application does not alone constitute sufficient injury. *See Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972).

**212**

Further, pursuant to the *Abbott Laboratories* test, it cannot be said that these issues are fit for decision. The government has only begun to formulate concrete practices to implement the general policies announced last year. It is as yet unclear precisely what regulations or practices will emerge regarding domestic organizations. Until they do emerge and are applied to plaintiff in "an actual factual setting," it is improper to make them the subject of a constitutional ruling. *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.,* 452 U.S. 264, 294–95, 101 S.Ct. 2352, 2369–70, 69 L.Ed.2d 1 (1981). Nor do I see much hardship to the parties in deferring decision. Surely defendants are not in any hurry for a ruling on policies they have yet fully to implement. Plaintiff cannot in good faith assert harm from delay. The claim that it is deterred from filing a grant application for fear that it will be asked to sign a contract clause which does not even appear to be relevant to its activities borders on the ludicrous. Until it gains approval of such an application—hardly a foregone conclusion—it cannot even know the specific contours of the policy which will be applied to it. It follows that prior to such approval, plaintiff's worries remain merely speculative and nonjusticiable.

Because the fourth and fifth causes of action could not survive a motion to dismiss, their addition to the complaint would be pointless. The motion to amend to assert these causes of action is denied. *See Marcraft Recreation Corp. v. Francis Devlin Co.,* 506 F.Supp. 1081, 1087 (S.D.N.Y.1981). I will permit plaintiff to file an amended complaint which includes the other changes which it has proposed, *i.e.,* the proposed amended complaint minus ¶¶ 37–40, 44, 45, and Exhibits 8–11.

In conclusion, defendants' motion to dismiss the third cause of action is granted; the remainder of the motion is denied. Leave to amend is denied except to the extent noted. The parties are directed to resume discovery under the care of Magistrate Raby, who I am sure will see to its prompt completion.

It is SO ORDERED.